STATE OF TENNESSEE
CIRCUIT COURT OF BLOUNT COUNTY

NEW MIDLAND PLAZA )
ASSOCIATES, )
A Tennessee General Partnership, )
MARTIN E. O'BOYLE, CATHERINE )
O'BOYLE SUCCESSOR TO JOHN E. )
O'BOYLE and CATHERINE )
O'BOYLE )
as tenants by the entireties, )
COMMERCE )
PARTNERSHIP NO. 1147, a Florida )
General Partnership, and COMMERCE )
PARTNERSHIP NO. 1171, a Florida )
General Partnership, )
 )
        Plaintiffs, )
 )
v. )
 )
FIRST UNION NATIONAL BANK, )
ALCOA CALDERWOOD, LLC (F/K/A )
COOLIDGE SOMERSET ALCOA, )
 LLC), DAVID FRAIMOW, )
MARSHALL )
ALLAN and FRED STAHL, )
 )
        Defendants. )

Civil Action No. E-18053

FILED
OCT 23 2008
JAMES A. CARROLL
CLERK & MASTER

---

## SPECIAL MASTER'S REPORT

---

Pursuant to the Court's Order filed March 18, 2002, the undersigned has been

appointed as Special Master to oversee and resolve discovery and scheduling disputes

and to report to the Court on those matters when necessary. Also, pursuant to the Court's

Order filed March 14, 2003, the undersigned has been appointed Special Master to report

EXHIBIT
C

to the Court concerning motions to dismiss and for summary judgment. The following

motions are considered in this Report:

> 1.    the motion filed by First Union National Bank ("First
> Union") to dismiss the Third Amended Complaint (filed
> October 15, 2001)[1];
>
> 2.    the motion filed by Defendants Coolidge Somerset
> Alcoa, LLC ("Coolidge"), now known as Alcoa Calderwood,
> LLC, Fred Stahl and Marshall Allan ("Coolidge Defendants")
> seeking partial summary judgment regarding alleged
> confidential financial information concerning Plaintiff Martin
> E. O'Boyle (served April 16, 2003);
>
> 3.    First Union's and Defendant David Fraimow's motion
> for summary judgment with respect to all claims asserted by
> Plaintiffs in this lawsuit (served August 21, 2003);
>
> 4.    the Coolidge Defendants' motion for partial summary
> judgment as to the conspiracy claim (served August 22,
> 2003); and,
>
> 5.    the Coolidge Defendants' motion for summary
> judgment on all claims (served August 22, 2003).[2]

Motion numbers 1 and 2 were argued on July 18, 2003. Motion numbers 3 and 4

were argued on October 1, 2003. Motion number 5 is being held in abeyance pending a

ruling by the Court on objections to the undersigned's May 20, 2003 and September 3,

---

[1]  Without waiving its motion to dismiss, First Union has agreed that the Court can
consider the motion, at least in part, as one for summary judgment. First Union's Reply Brief
served July 14, 2003. In response to the motion, the Plaintiffs presented matters outside the
pleadings. T.R.Civ.P. 12.02.

[2]  First Union and Mr. Fraimow have adopted the Coolidge Defendants' motions for
summary judgment.

2003 Special Master Reports. The Court's ruling on those objections will likely be dispositive of that particular motion.

## I. Introduction

New Midland Plaza Associates ("New Midland") owns a 365,000 square foot shopping center in Alcoa, Blount County, Tennessee. It and the other Plaintiffs have brought suit against Defendants First Union, David Fraimow, a loan officer employed by First Union, and the Coolidge Defendants alleging that the Defendants engaged in wrongful and concerted conduct, the end and aim of which was to cause the bankruptcy and financial demise of New Midland and to wrest control of the Midland Center from Plaintiffs. Third Amended Complaint ¶ 1.

Plaintiffs claim that First Union and Mr. Fraimow are guilty of intentional fraud because they falsely represented to New Midland that the loan on the shopping center matured on September 30, 1998, when, in fact, these Defendants knew that the deadline for repayment of the loan had been extended. Id., Count I.

Plaintiffs' claim that all of the Defendants conspired to commit a series of unlawful acts directed toward New Midland and/or to commit lawful acts through unlawful means by interfering with New Midland's business and contractual relationships by causing the financial ruin of New Midland and by interfering with New Midland's contractual relationship with the City of Alcoa. Id., Count II.

3

Plaintiffs claim that First Union breached a loan agreement between it and New Midland by, among other things, declaring the loan to have matured when it had not so matured, by diverting to itself New Midland's funds which had been earmarked for payment to the City of Alcoa, to Blount County and for structural and other capital improvements. Id., Count III.

Plaintiffs claim that First Union breached a fiduciary duty owing to New Midland which arose due to First Union's domination and control over the operation of the New Midland shopping center. Plaintiffs claim that a de facto joint venture was created between First Union and New Midland and that First Union breached its fiduciary duty to the joint venture by, among other things, sweeping some $687,000 from New Midland's bank accounts on October 1, 1998 and thereby depriving the joint venture of monies needed for continued operations. Id., Count IV.

Plaintiffs claim that Defendants are liable for statutory inducement of breach of contract in violation of Tenn. Code Anno. § 47-50-109. Plaintiffs allege that Defendants wrongfully interfered with the lease agreements between New Midland and its shopping center tenants by sending notices that rents were to be paid to First Union and not to New Midland or the property manager. Additionally, Plaintiffs allege that Defendants wrongfully interfered with an agreement between New Midland and the City of Alcoa. Id., Count V.

4

Plaintiffs claim that Defendants tortiously interfered with New Midland's business relationships. This claim is based on conduct alleged in Count V of the third amended complaint and, as to the Coolidge Defendants, their alleged misrepresentation of their identities in discussions with New Midland shopping center tenants, alleged conversion of rent payments made by Midland Center tenants and their alleged interference with New Midland's contractual obligations to the City of Alcoa. Id., Count VI.

Plaintiffs claim that First Union and Coolidge have received rents and other payments collected from New Midland shopping center tenants and have wrongfully converted them to their own use. Id., Count VII.

Plaintiffs claim that First Union breached an implied-in-law contract by providing Mr. O'Boyle's financial and banking information to third parties, including Coolidge, without first obtaining Mr. O'Boyle's permission. Id., Count VIII.

The Defendants contend that there are no genuine issues of material fact remaining for decision and that they are entitled to judgment as a matter of law. T.R.Civ.P. 56.04. Parties who seek summary judgment shoulder a heavy burden and all doubts are to be resolved in favor of the non-moving parties. See Part II, infra. Despite these principles and despite the lengthy history of this case, the voluminous filings and extensive arguments, there are some incontestible facts and conclusions to be drawn from them that are controlling.

New Midland was put on notice in June 1998 that the loan was due to be paid in full on September 30, 1998 and that no more extensions would be granted. New Midland failed to pay off the loan on September 30, 1998 and that was an event of default which breached the loan agreement and set in motion the events that followed. There is no basis for estopping First Union or the other Defendants from relying on that event of default in connection with the actions they took. There are no genuine issues of material fact remaining in connection with the fraud claim, the breach of contract claim, the breach of fiduciary duty claim, the statutory inducement of breach of contract claim, the tortious interference with business relationship claim, the conversion claim and the implied-in-law contract claim and the Defendants are entitled to judgment as a matter of law on all of these claims.

## II. Standard for Summary Judgment

According to Rule 56.03 of the Tennessee Rules of Civil Procedure, summary judgment is to be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Byrd v. Hall, 847 S.W.2d 208, 210 (Tenn. 1993). Rule 55.06 of the Tennessee Rules of Civil Procedure provides that the non-moving party "may not rest upon the mere allegations or denials of his pleadings, but his or her response, by affidavits or

6

[otherwise], must set forth specific facts showing that there is a genuine issue for trial."
Id.

The summary judgment procedure was implemented to enable the courts to pierce the pleadings to determine whether the case justifies the time and expense of a trial. Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986). "Consequently, a motion for summary judgment goes directly to the merits of the litigation, and a party faced with such a motion may neither ignore it nor treat it lightly .... [s]ummary judgment is not a disfavored procedural shortcut but rather an important vehicle for concluding cases that can and should be resolved on legal issues alone." Byrd, 847 S.W.2d at 210 (citation omitted).

In determining whether or not the genuine issue of material fact exists for purposes of summary judgment, courts in this state have indicated that the question should be considered in the same manner as a motion for directed verdict made at the closing of plaintiff's proof, i.e., the trial court must take the strongest legitimate view of evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. Carvell v. Bottoms, 900 S.W.2d 23, 26, (Tenn. 1995). "Then if there is a dispute as to any material fact or any doubt as to the conclusion be drawn from the fact, the motion must be denied." Byrd, 847 S.W.2d at 211.

7

Moreover, the court makes it clear that "the party seeking summary judgment must carry the burden of persuading the Court that no genuine and material factual issues exist and that it is, therefore, entitled to a judgment as a matter of law." Byrd, 847 S.W.2d at 211.

Summary judgment is an exacting standard. It should be granted only when the facts and conclusions to be drawn from the facts permit a reasonable person to reach but one conclusion. Godfrey v. Ruiz, 90 S.W.3d 692, 695 (Tenn. 2002); Byrd, 847 S.W.2d at 212.

### III. Factual Background

On March 29, 1988, First Union's predecessor-in-interest, Meridian Mortgage Corporation, loaned New Midland the principal sum of $8.9 million, evidenced by a promissory note and deed of trust on the New Midland Plaza. The original loan was a construction loan agreement that was payable fifteen months from the date of execution. The loan was modified on four separate occasions, and Plaintiffs contend in this suit that the loan was also modified to extend the maturity date of the loan to October 31, 1998 and then to January 15, 1999. The third loan modification agreement was executed December 22, 1992 and extended the maturity date of the loan until December 31, 1994. The loan matured on that date but the fourth loan modification agreement was not executed until January 1, 1996. Upon the expiration of the third loan modification agreement, New Midland continued making monthly principal and interest payments and

8

the bank accepted such payments. The bank took no actions to collect the loan at that time. Rather than calling the loan on or about December 31, 1994, a predecessor bank to First Union entered into negotiations with New Midland that resulted in the fourth loan modification agreement executed as of January 1, 1996 and extended the maturity date until September 30, 1998. The fourth loan modification agreement was for a period of two years and nine months and the monthly payments were based on a 330-month amortization schedule that resulted in monthly payment of approximately $51,000. On September 30, 1998, the maturity date of the fourth loan modification agreement, a "balloon" payment of the remaining principal amount was due in the amount of approximately $6.1 million.

Through a series of mergers, by 1998 First Union was the holder of the note and deed of trust on the New Midland Plaza Shopping Center. On June 8, 1998, David E. Fraimow, a vice president and loan officer employed by First Union, sent New Midland a letter informing it that no further extensions would be granted and that it expected the loan to be paid in full on the September 30, 1998 maturity date. Exhibit 8 to First Union's and David Fraimow's Statement of Undisputed Material Facts.

The loan was not paid at the maturity date of September 30, 1998. On October 1, 1998, First Union exercised its rights under the loan documents to offset monies in certain accounts maintained by New Midland totaling $687,038.56. First Union notified

9

New Midland of its action on that same date, October 1, 1998, and the funds were applied to accrued interest on the loan and then to principal.

Thereafter, First Union and New Midland entered into negotiations in an effort to resolve the matter. The bank took no further action to collect from its collateral until on or about March 31, 1999. During the same time period, New Midland continued to make the approximately $51,000 monthly payments that it had been making under the old amortization schedule. While these negotiations were ongoing, the bank prepared a series of internal documents that described the loan history, the ongoing negotiations, and the bank's plan for collection. These Loan Resolution Summaries set forth a brief history of the problem, the unpaid loan, a summary of key events, progress towards a resolution, and an analysis of the expected repayment sources. Exhibits 9, 10, 11 and 12 to First Union's and Mr. Fraimow's Statement of Undisputed Material Facts. The loan resolution plan summaries anticipated that New Midland would file for Chapter 11 bankruptcy protection rather than suffer a foreclosure. They also predicted that the bank would be successful in relief from the bankruptcy stay and that the bank would be able to sell the property in satisfaction of the debt. These loan resolution plan summaries do not indicate that the bank was interested in owning the shopping center.

For purposes of the pending motions, First Union and Mr. Fraimow concede that pursuant to internal documentation, First Union extended the loan maturity date on two occasions, first to October 31, 1998 and then to January 15, 1999. Neither New Midland

10

nor any of the Plaintiffs were made aware of these extensions until well after January 15, 1999. The first such extension was not signed by Mr. Fraimow or approved until about November 1998 and retroactively approved an extension to October 31, 1998. The second such extension was signed by Mr. Fraimow on December 2, 1998, approved by other bank officers on December 8 and 10, 1998, and extended the loan until January 15, 1999.

Plaintiffs dispute the Defendants' contention that the subsequent extensions to October 31, 1998 and January 15, 1999 were not approved until after the September 30, 1998 default. They base this on a First Union untitled internal document which is Exhibit C to New Midland's opposition. The document is a printout of a computer screen display that includes the date of October 31, 1998 under a field for "maturity date." On its face, however, the document does not purport to have been prepared prior to the default date of September 30, 1998. Nothing in that document supports New Midland's claim that the alleged maturity date extension occurred before New Midland defaulted. New Midland previously argued that this screen print was prepared in September because it was attached to a Loan Status Change Form prepared in September 1998 which was offered as a collective exhibit during a deposition. However, the affidavit of Michael Jordan dated July 2, 2003 submitted with First Union's reply brief in support of its motion to dismiss established that the print-out of the computer screen was "not prepared at the same time as the Loan Status Change Form."

11

Plaintiffs' own experts admitted that the alleged extensions occurred after the

September 30 default and the October 1 sweep of collateral accounts.

> Q: And as I understand your report, based upon the documents that you have reviewed, you have determined that after — sometime after October 1, there were then two extensions of this loan; is that correct?
>
> A: By the bank?
>
> Q: Yes, sir.
>
> A: Yes.

Deposition of Leslie A. Patten at 118, Exhibit 7 to First Union's Statement of Material

Undisputed Facts.

New Midland's failure to pay the loan at the September 30, 1999 maturity date

was an event of default. The Plaintiffs' own experts agree with this statement.

> Q: So, can we agree, just in the general scheme of things — we can talk about extensions later — but there was an event of default on September 30, 1998. There's no question about that, is there?
>
> A. By the non-payment of the balloon amount, yes, sir.

Deposition of Leslie A. Patten at 120-21. Expert Gary Schwartz was also questioned

about the September 30, 1998 default. He agreed that there was an event of default on

that date and also that there was another event of default on January 15, 1999 when the

loan was not paid at that time. Deposition of Schwartz at 117, Exhibit 6 to First Union's

12

Statement of Material Undisputed Facts. Mr. Schwartz also testified that on October 1, 1998, First Union had the right to send a foreclosure notice to New Midland. Id. at 120.

Plaintiffs' experts also agree that after the extension to October 31, 1998, First Union was under no obligation to return the approximately $687,000 that it had previously offset on October 1, 1998. Patten Deposition at 92-93, 97, 135-37; Schwartz Deposition at 117-18, 129-30.

As of March 1999, New Midland and First Union had not executed a new loan modification agreement. On or about March 30, 1999, First Union notified the Midland Center tenants that the tenants should make rent payments to First Union. The bank also offset additional moneys in various collateral accounts that it held on or about March 30, 1999.

On April 19, 1999, First Union commenced foreclosure proceedings pursuant to its deed of trust by sending New Midland a notice of foreclosure. New Midland first sought and obtained a temporary restraining order and temporary injunction against the foreclosure in this Court. After the injunction expired, First Union again commenced foreclosure proceedings. In order to stop the foreclosure, New Midland filed a Chapter 11 bankruptcy petition in Florida which stayed that foreclosure.

Negotiations between First Union and the Coolidge Defendants took place after May 12, 1999 and resulted in the execution of the "Loan Sale Agreement" on October 4, 1999. Exhibit G to Coolidge Defendants' Statement of Material Undisputed Facts.

13

There is a dispute regarding whether or not Coolidge saw or reviewed and personal financial information related to Mr. O'Boyle while conducting its due diligence in connection with this sale. On December 1, 1999, the date the loan was sold, First Union ceased to have any interest whatsoever in the loan's proceeds or collateral. Plaintiffs' experts agree that the purchase of the note from First Union was proper. Schwartz Deposition at 134-56; Patten Deposition at 137-41. Exhibits 6 and 7 to First Union's and Mr. Fraimow's Statement of Undisputed Material Facts.

After the loan sale, the Bankruptcy Court confirmed a plan of reorganization for New Midland Plaza Associates.

### III. Analysis

#### A. Count I, Intentional Fraud – First Union and Fraimow

The elements of an intentional fraud claim under Tennessee law are: (1) an intentional misrepresentation, (2) knowledge of the representation's falsity, (3) the plaintiff reasonably relied on the misrepresentation and suffered damages, and (4) the misrepresentation relates to an existing or past fact. Tschira v. Willingham, 135 F.3d 1077, 1087 (6th Cir. 1998), citing Hill v. John Banks Buick, Inc., 875 S.W.2d 667, 670 (Tenn. App. 1993).

There is a very straightforward reason why Defendants Fraimow and First Union are entitled to summary judgment in connection with this claim. Neither Defendant, nor any of First Union's other employees, ever made a misrepresentation regarding the

14

September 30, 1998 loan maturity date upon which the Plaintiffs relied. First Union and Fraimow concede, for purposes of these motions, that the loan maturity date was extended first to October 3, 1998 and then to January 15, 1999. But that was not done until after the September 30, 1998 default and was not known to Plaintiffs until well after January 15, 1999, at time when New Midland was indisputably in default on the loan. The loan extensions were internal undertakings by First Union and were accomplished in November and December, well **after** New Midland had defaulted on the loan by non-payment on September 30, 1998.

Plaintiffs attempt to dispute the fact that the subsequent extensions to October 31 and January 15 were approved after the September 30, 1998 default. See Plaintiff's Response to Defendant First Union National Bank and David Fraimow's Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment, Response 25. They cite to a First Union untitled internal document, Exhibit C to New Midland's Opposition. The Plaintiffs pressed that contention because Exhibit C was attached to a deposition exhibit which had other documents attached which had dates on them prior to September 30, 1998. Michael Jordan, Senior Vice President of Wachovia Bank, N.A., successor to First Union, explains in his July 2, 2003 affidavit that the document relied on by Plaintiffs (Exhibit C) was not prepared at the same time as the other documents. Exhibit A to First Union's Reply Memorandum in Support of Motion for Summary Judgment. There simply is no proof in the record that Exhibit C (Bates No. FU 0004951)

15

was created before September 30, 1998. Therefore, the fact that it shows a loan maturity date of October 31, 1998 does not prove that the maturity date was extended prior to September 30, 1998. In any event, even if it is assumed that it had been created prior to September 30, 1998, Plaintiffs could not have relied on the extension since they would not have known about it. Additionally, First Union has documented in the record when and how the loan maturity dates were extended in November and December 1998. Exhibits 15 and 16 to First Union and Fraimow's Statement of Undisputed Material Facts.

There is no dispute that Mr. Fraimow sent the Plaintiffs a letter dated June 8, 1998 which, inter alia, advised "that the Bank will not consider any further extension of the Maturity Date [September 30, 1998] nor a 'terming out' of the loan and it is expected that on or before the Maturity Date the Loan will be paid in full, including all principal, interest, fees, charges and expenses and costs due the bank under the Loan Documents." Exhibit 8 to First Union and Fraimow's Statement of Undisputed Facts. If there was some sort of "course of dealing" or "course of performance" that might have caused Plaintiffs to expect a fifth loan extension, this letter ended that.

For the first time,[3] the Plaintiffs argued on October 1, 2003 that Mr O'Boyle's deposition testimony at pages 36-40, 62-75 and 179 creates a genuine issue of material fact as to whether Mr. Fraimow made misrepresentations to Mr. O'Boyle between the time of the June 8 letter and the default of September 30.

I have read those pages, and no reasonable jury could conclude that the testimony in question creates a genuine issue of material fact regarding alleged fraudulent representations by Mr. Fraimow.

For example, Mr. O'Boyle recounted the following regarding his conversations with Mr. Fraimow before the loan matured:

> Again, the conversations that I had with Mr. Fraimow did not, **the core of the conversation usually was not relative to the maturity date or what would happen beyond the maturity date of the loan.** It was usually a conversation with about some other matter, and usually he would be calling me and in his own way badgering or sort of giving me a hard time, and I remember him mentioning, and I don't remember exactly when, you know, the loan is maturing, what are your plans? I do remember perhaps not those exact words, but certainly that theme, and there were several conversations, but again, I don't know that I can recite them.
>
> Q.   What do you recall telling him in response to the general question about what are your plans?

---

[3] In Plaintiffs' brief in opposition to First Union's Motion for Summary Judgment at p. 12, Plaintiffs cite to Mr. O'Boyle's deposition testimony for the proposition that Mr. Fraimow "had discussed a further loan modification with Mr. O'Boyle." This is a far cry from arguing that these conversations involved misrepresentations of material fact upon which Plaintiffs relied to their detriment.

17

A.   Well, that we would be attempting to see what alternate financing is available.  We would like to get a proposal from the bank to renew – I'm looking for a word and I'm not thinking of it – recast the loan and so forth.

Q.   Do you recall suggesting to Mr. Fraimow that the bank should consider terming out the loan?

A.   Oh, of course, yes.  I thought that was the appropriate thing to do, not what he did, sir.

Q.   What specifically, what specific conversations or communications do you recall concerning the potential terming out of the loan?

A.   **I don't recall any specific conversations at any particular point in time relative to the terming out of the loan,** although I did say to him that I thought that was the appropriate thing to do.

Q.   Do you recall specifically what he said in response?

A.   I don't.  **But I know we had discussions about modifying the loan,** and when I say modifying, recasting or renewing the loan, but I can tell you this as well, that we never had discussions about him taking on October 1st $687,000 out of the bank and then renewing the loan without telling the borrower.  I query whether that's a crime.

Q.   Are you personally aware of efforts being made by persons within New Midland in the summer of 1998 to obtain refinancing for the loan?

A.   Yes.

Q.   What do you know about those efforts?

A.   I know that there were several efforts, when I say several, there were multiple lenders contacted in connection

18

> with the loan. We were looking for a substantial amount of
> money, adequate to pay First Union Bank in full and
> adequate to pay the city in full since, as you know, Charlie,
> First Union breached their agreement and refused to pay the
> city.

Deposition of Martin O'Boyle, August 22, 1999 at 178-80 (emphasis added).

It is very disappointing that counsel for Plaintiffs presented this statement in a

PowerPoint© presentation during arguments on October 1, 2003.

> Because of misrepresentations and promissory fraud by
> Fraimow to Marty O'Boyle that NM should "not worry"
> because FU would extend the loan.

This is a mischaracterization of O'Boyle's testimony to say the least.

Mr. O'Boyle's own testimony establishes that between June 8 and September 30,

1998, he had every reason to worry and no reason to assume that First Union would

withdraw its June 8 letter and ignore New Midland's default.

Moreover, O'Boyle specifically negates any promises by Mr. Fraimow that would

have made it reasonable for him to disregard Fraimow's June 8 letter or that would have

reasonably induced a "don't worry" attitude.

> Q. Mr. O'Boyle, can you specifically recall any
> particular conversation with Mr. Fraimow between June 8,
> 1998, and September 30, 1998, in which he told you he
> would extend the loan?
>
> A. You've asked me that question, I believe. I've
> answered that question, I believe. But unlike Mr. Fraimow,
> I'm going to try to help you out and answer the questions to
> move things along rather than be an obstructionist. During
> the period before September 30[th], after September 30[th], there

19

were several discussions with Mr. Fraimow, and those
discussion varied; under no circumstances is the loan being
extended, how long of an extension do you need, we'll
consider this type of extension, and so forth.

**Did he ever suggest to me or make a specific
proposal to me before September 30th in writing to extend
the loan? I don't believe so, but again, this is a bank that
only turns over certain documents and doesn't turn over
certain documents.** I haven't looked at my files in years,
and until we get all the documents from the bank, we're never
going to know what those rascals did.

Id. at 205-06 (emphasis added).

Mr. O'Boyle testified that he and Fraimow discussed extensions of the loan before

and after September 30, 1998. Id. at 204-05, 212. But testimony that the bank would or

might **consider** an extension is a far cry from an intentional misrepresentation of an

existing or past fact. Why was New Midland trying to arrange alternative financing if it

was being misled about the loan maturity date?

Had Mr. Fraimow stated to Mr. O'Boyle prior to September 30, something along

the lines of "don't worry, the bank will extend your loan again," and had Mr. O'Boyle

changed New Midland's position in reliance on that to its detriment, there would have

been stated a claim for intentional fraud. But, that did not happen.

There is no substance at all to the assertion that this testimony and the other cited

testimony creates a genuine issue of material fact regarding the Plaintiffs' claim of

intentional fraud. Fraud must be pleaded with particularity. T.R.Civ.P. 9.02. The only

fraud pleaded in the Third Amended Complaint is that "First Union and Fraimow falsely

20

represented to New Midland that the loan matured on September 30, 1998 when both Defendants knew that the maturity date of the Loan had been extended." Count I, Third Amended Complaint. Mr. O'Boyle's own testimony is that in his discussions with Fraimow before the default "the core of the conversations was not relative to the maturity date or what would happen beyond the maturity date of the loan." There is nothing in the cited testimony from which a jury could find that Fraimow made a fraudulent statement of existing or past fact, upon which Plaintiffs could have relied.

Viewing the evidence and all reasonable inferences from it in Plaintiffs' favor, summary judgment is appropriate on the intentional fraud claim because the facts and inferences permit a reasonable person to reach only one conclusion – there was no fraud. See Doe v. HCA Health Servs. of Tennessee, Inc., 46 S.W.3d 191, 196; Byrd v. Hall, 847 S.W.2d 208, 210 (Tenn. 1993). Plaintiffs have no evidence to support essential elements of this claim, i.e., that misrepresentations of existing or past fact were made and that Plaintiffs relied on them to their detriment. When the non-moving party has had adequate time for discovery, as is the case here, and has no evidence to support an essential element or elements of its claim, summary judgment should enter. Street v. J.C. Bradford and Co., 886 F.2d 1472, 1479 (6th Cir. 1989).[4] The court "no longer has the

---

[4] The Tennessee Supreme Court embraced the construction of F.R.Civ.P. 56 in Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), Celotex Corp. v. Catrett, 477 U.S. 317 (1986) and Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986) to the extent adopted in Byrd v. Hall. Street v. J.C.Bradford and Co., is based on this trilogy of Supreme Court cases.

21

duty to search the entire record to establish that it is bereft of a genuine issue of material fact." Id. at 1479-80. The Defendants Fraimow and First Union have affirmatively negated a claimed basis for the intentional fraud claim, i.e., Defendants have shown conclusively that there is no evidence in this record that prior to Plaintiffs' default on the loan on September 30, 1988, Mr. Fraimow or any other agent of First Union misrepresented or concealed and past or existing fact upon which the Plaintiffs relied. Where a moving party negates a basis for a claim, the non-moving party may no longer simply rely upon the pleadings, but must then establish the essential elements of the claim. Crisp v. Liberty Mutual Ins. Co., ___ S.W.3d ___, No. M2002-01236-WC-R3-CV, 2003 Tenn. LEXIS 341 *3 (Tenn. Sup. Ct., May 2, 2003).

## B. Count II, Civil Conspiracy
### All Defendants

The parties agree that under Tennessee law, the elements of a civil conspiracy are: (1) a combination between two or more persons, (2) to accomplish by concert of action, (3) for an unlawful purpose, or a purpose not itself unlawful but by unlawful means, and (4) resulting in damage caused by any action taken pursuant to the combination. See Chenault v. Walker, 36 S.W.3d 45, 52 (Tenn. 2001); Dale v. Thomas H. Temple, Co., 208 S.W.2d 344, 353 (Tenn. 1948). "The essence of a civil conspiracy is concert of action between the conspirators to defraud or cause other injury to a person or property." 6 Tennessee Jurisprudence: Conspiracy § 3 at 402 (2002), citing Smoky Mountain Beverage Co. v. Anheiser-Busch, Inc., 182 F.Supp. 326 (E.D. Tenn. 1960) and Kirksey

22

v. Overton Publication, Inc., 739 S.W.2d 230 (Tenn. App. 1987). In order for there to be liability, there must be an overt act resulting in damages. Tennessee Publishing Co. v. Fitzhugh, 165 Tenn. 1, 6, 52 S.W.2d 157 (1932). Actionable damage must be alleged and must be shown to be recoverable as of the time of the bringing of the action. Id. at 4. Civil conspiracy requires a common design, concert of action, and an overt act. Koehler v. Cummings, 380 F. Supp. 1294, 1313 (M.D. Tenn. 1974).

The **"primary purpose"** of a civil conspiracy must be to cause injury to another; incidental injuries resulting from a pursuit of the parties' own fair interest are not actionable." Lipman v. First National Bank of Boston, No. 01A01-9803-CH-00139, 1999 Tenn. App. LEXIS 87 (Tenn. Ct. App., February 5, 1999) at *12. Mr. Lipman was a limited partner in a real estate limited partnership. He lost $200,000 when the general partners sold the real estate asset of the partnership pursuant to an agreement with the defendant bank. The proceeds of the sale paid off the bank loan and some of the other legitimate debts but plaintiff did not receive any proceeds.

The plaintiff settled with the general partners but sued the bank alleging that it had conspired with the general partners or that the bank had induced the general partners to breach their partnership agreement with the plaintiff or the fiduciary duties the general partners owed him.

Summary judgment for the bank was affirmed. The court held:

> The record in this case contains no facts indicating an
> agreement between [the general partners] and the bank for the

23

> purpose of causing injury to Lipman. Indeed, there are no
> facts, save for bare speculation, at most, that Lipman actually
> suffered injury by this transaction. While it is true that he lost
> his investment by the sale of Washington Square I, the
> property was in dire financial condition when purchased by
> the [general partner] interests.

Id. at *12. The key language in the case is this: "In order to defeat summary judgment,

Lipman must present specific admissible facts which realistically challenge the [general

partner's] stated reasons for their business decisions." Id. at *15.

This case, like Lipman, involved a problem real estate loan. Plaintiffs' loan began

in 1988 as a construction loan which was due and payable within fifteen months. Exhibit

1 to First Union's Statement of Undisputed Facts. It was extended four times and in June

1998, First Union notified New Midland that no more extensions would be allowed and

that the loan must be paid in full by September 30, 1998. It was not paid and First Union

attempted to exercise the contractual remedies to which New Midland had agreed. After

New Midland filed suit to enjoin foreclosure, it then entered into negotiations with

Coolidge which resulted in the sale of the note, at a discount, to Coolidge.

Just as in Lipman, Plaintiffs have not presented specific admissible facts which

realistically challenge the business decisions made by First Union and Coolidge.

Exhibits 9, 10 and 11 to First Union's Statement of Material Undisputed Facts are First

Union's Loan Resolution Summaries. They say nothing about "stealing the shopping

center" from Plaintiffs; rather, they reveal that the bank temporarily exercised

forbearance after the default although it assumed that the borrower would not be able to

24

refinance or sell the shopping center. The bank assumed that it would have to foreclose, that Plaintiffs would pursue Chapter 11 proceedings, that the bank would obtain relief from the stay and **sell** the shopping center in order to pay off the loan. There is nothing in these Loan Resolution Summaries to indicate that the bank wanted to own the shopping center or "steal" it from the Plaintiffs. Additionally, there would have been nothing stopping the Plaintiffs from bidding in at a foreclosure sale or from simply paying off the debt. Plaintiffs' contention that the bank was out to "steal" the shopping center from them is fanciful, speculative and totally unsupported in the record.[5]

The following entry was made in the Loan Resolution Plan Summary on March 29, 1999:

> Meeting 3/29 with the Bank counsel, Marty O'Boyle and Borrower counsel. Discussed various agenda points in effort to try and reach agreement on extension/forbearance of loan while Borrow moves to sell shopping center and pay off the loan. It became clear after discussing a number of items, including issues with the City of Alcoa bonds, that an agreement was not going to be reached. Bank is to commence legal remedies including noticing of tenants for collection of rents and notice of non-judicial foreclosure sales.

---

[5] Plaintiffs' argument that the foreclosure would have occurred so quickly (21 days) that they could not have protected their interest in the property does not hold water. The bank assumed all along that foreclosure would be a lengthy process because New Midland would seek Chapter 11 protection. There would be plenty of time for a prospective buyer to perform "due diligence." Furthermore, the property would likely be under the protection of the bankruptcy court.

25

Exhibit 11 to First Union's Statement of Material Undisputed Facts; see also Affidavit of

Michael Jordan dated August 21, 2003. This is an example of how the bank's records

reveal rational business decisions rather than some type of scheme to "steal" the

shopping center.

The difficulty all along was that Plaintiffs simply did not have the capacity to pay

off the loan when it came due on September 30, 1998. The Plaintiffs' own expert agrees

that the Plaintiffs did not have that capacity. Deposition of Gary M. Schwartz taken

August 13, 2003 at 36.

First Union's position is that the specific "unlawful" act set forth in Paragraph 39

of the Complaint did not occur until May 12, 1999 – six months after First Union

declared the loan to be in default and six weeks after First Union mailed the tenant

notification letters.[6] The conspiracy could not have begun until such time as an overt act

in furtherance of it was committed. See Emerson v. Machamer, 221 Tenn. 739, 744, 431

S.W. 2d 253 (1968).

First Union contends that the "unlawful acts" which it is alleged to have

committed after the formation of the alleged conspiracy, i.e., entering into an agreement

with Allan under which Allan was allowed to review loan-related documents, First

Union's concealment of the agreement, First Union's sale of the loan to Coolidge and

First Union's failure to disclose its negotiations with Coolidge relating to the sale of the

---

[6] The alleged unlawful act was the alleged disclosure of Mr. O'Boyle's confidential
financial information by First Union to Coolidge.

26

loan until after the sale was completed, were just "normal incidents of a commercial loan sale." First Union insists that it had no obligation to provide New Midland with notice of its negotiations with Coolidge.

There are several incontestable facts that should be noted. Negotiations between First Union and the Coolidge Defendants took place after May 12, 1999 and resulted in the execution of a Loan Sale Agreement in early October 1999. There could have been no conspiracy prior to May 12, 1999 when First Union first began discussions with the Coolidge Defendants. First Union and Fraimow could not have been part of a conspiracy before May 12, 1999 since they are considered the same entity for purposes of conspiracy law. See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 769, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984); Trau-Med of America, Inc. v. Allstate Ins., 71 S.W.3d 691, 702-05 (Tenn. 2002).

The Plaintiffs argue that the Coolidge Defendants joined a conspiracy and thereby became liable for Fraimow's and First Union's acts which preceded May 12, 1999. But, the cases cited by the Plaintiffs refer to defendants who join **ongoing conspiracies**. See Havoco of America, Ltd. v. Shell Oil Co., 626 F.2d 549, 554 (7th Cir. 1980); Savannah College of Art and Design v. School of Visual Arts, Inc., 464 S.E.2d 895 (Ga. App. 1995).

In order for the Coolidge Defendants to have conspired with Fraimow and First Union, that conspiracy had to take place between May 12, 1999 and December 1, 1999 –

27

the date the loan was sold to Coolidge for $4.5 million.[7] After that sale took place, Fraimow and First Union ceased to have any legal interest in the loan's proceeds or collateral. Since a civil conspiracy requires, inter alia, common design and concert of action, the "bookends" of this alleged conspiracy would appear to be May 12 to December 1, 1999.[8]

Right away, it can be seen that there can be no liability for civil conspiracy on any Defendant's part prior to May 12, 1999 because there could have been no conspiracy. This fact removes these actions as possible overt acts in support of the conspiracy:

1. First Union and Fraimow's declaration of default on October 1, 1998;

2. First Union's internal extensions of the loan maturity dates to October 31, 1998 and January 15, 1999;

3. First Union's sweeping of New Midland's cash accounts on October 1, 1998;

4. First Union's collection of rents from Midland Center tenants in March and April 1999; and,

5. First Union's commencement of foreclosure proceedings on April 19, 1999 by sending New Midland a notice of foreclosure.

---

[7] This was 85% of what First Union was owed on the loan at the time.

[8] None of the alleged "improper actions" of First Union are claimed to have occurred after December 1, 1999, perhaps with the exception of the alleged disclosure of O'Boyle's personal financial information. That will be dealt with in Part III, infra.

28

The undersigned has recommended that two of the other allegedly "improper actions" taken by Defendants are not actionable and are subject to being summarily dismissed.[9] Report and Recommendation dated August 7, 2003. This pertains to Plaintiffs' contention that First Union and Mr. Fraimow refused to approve New Midland's lease with Hancock Fabrics and Coolidge's delay in executing non-disturbance agreements for the lease. Since there is no basis for these claims, they cannot serve as unlawful or otherwise improper actions (overt acts) in support of a civil conspiracy claim.

That leaves the following claimed "improper actions" in support of the conspiracy claim:

1.  Allen and Stahl's misrepresentation of their identities to the Midland Center tenants in an attempt to obtain confidential information about the Center and New Midland;

2.  Coolidge's objections to New Midland's plan of reorganization despite that New Midland's plan provided for repayment of the Loan in full;

3.  Coolidge's circulation of a competing plan of reorganization during the exclusivity period established by the bankruptcy code;

4.  Coolidge's solicitation of the City of Alcoa for its vote in favor of Coolidge's plan during the exclusivity period established by the bankruptcy code;

---

[9] The most complete averment of alleged "improper actions" taken by Defendants is set forth at pages 15 and 16 of Plaintiffs' Opposition to Coolidge Defendants' Motion for Partial Summary Judgment as to the Conspiracy.

29

5.     Coolidge's presentation of false testimony to the bankruptcy court by allowing its expert witness to testify to a value of the Midland Center which Coolidge knew to be incorrect;

6.     Coolidge's refusal to produce documents and witnesses for deposition during the bankruptcy hearing; and,

7.     First Union's disclosure of Mr. O'Boyle's personal financial information to Coolidge.[10]

First Union points out that Allan and Stahl's alleged trespassing on the shopping center premises and alleged misrepresentations made to tenants cannot be part of a conspiracy. First Union and Coolidge had a letter agreement dated May 12, 1999 which prohibited Coolidge's agents, employees or representatives from, inter alia, performing site visitation investigations without prior written consent of First Union. Exhibit 9 to the Alcoa deposition, taken January 22, 2002. Allan and Stahl did not have such permission and so their activities were adverse to First Union as opposed to being in support of a conspiracy. See e.g. Dale v. Thomas H. Temple Co., 208 S.W.2d at 353 (one of the elements of a civil conspiracy is "concert of action").

"Improper actions" 2 through 6 set out above all relate to Coolidge's conduct during New Midland's Chapter 11 proceeding. The undersigned has recommended that Plaintiffs be barred under res judicata principles from litigating or relitigating these and any other core bankruptcy issues in this litigation as to their lawfulness or propriety for

---

[10] This "improper action" will be dealt with in Part III.G, infra.

purposes of Plaintiff's 'unlawful acts or means" civil conspiracy claims. <u>Res judicata</u>

principles preclude litigation or relitigation of core issues which were raised or could

have been raised in the Chapter 11 proceedings insofar as their lawfulness or propriety

for purposes of Plaintiffs' "unlawful acts or means" civil conspiracy claim is concerned.

Special Master's Report filed September 10, 2003 (as clarified at the October 1, 2003

hearing).

The "illegal means" prong of civil conspiracy is the only one relied upon by

Plaintiffs.

> SPECIAL MASTER MURRIAN: Let me just ask
> Plaintiffs a quick question. Are the Defendants correct that
> you're only relying on the illegal means prong of the civil
> conspiracy claim?
>
> MR. BLACK:    Improper or illegal means.
>
> SPECIAL MASTER MURRIAN:  Okay.
>
> MR. BLACK:  Is that correct, Mark?
>
> MR. GUBERMAN:    I think that's – I think that's
> accurate.
>
> MR. BLACK:  All right.
>
> SPECIAL MASTER MURRIAN:   All right.

Transcript of Proceedings, October 1, 2003 at 99. Later in the hearing, counsel for

Plaintiffs asserted that the Plaintiffs had argued the one theory ("unlawful means for a

lawful purpose") "for purposes of summary judgment" but had not abandoned the "lawful means to accomplish an unlawful purpose" theory of civil conspiracy. Id. at 135.

That is not how summary judgment works. First Union moved for summary judgment on **all** claims and adopted Coolidge's motion for summary judgment in connection with the conspiracy claim. Plaintiffs were clearly on notice of that. They did not argue the "lawful means to accomplish an unlawful purpose" theory in their brief or during the October 1 hearing. They cannot simply "reserve" that matter for trial. When confronted with a properly supported motion for summary judgment, the non-moving party "may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or [otherwise], must set forth specific facts showing there is a genuine issue for trial." Byrd v. Hall, 847 S.W.2d at 210.

Additionally, even if Plaintiffs were allowed to argue that prong of the civil conspiracy claim, they have not presented specific admissible facts which realistically challenge the business decisions made by Defendants and therefore, just as in the Lipman case, the conspiracy claim fails.

Plaintiffs point to the Loan Sale Agreement between Coolidge and First Union as evidence of a conspiracy. Exhibit G to Coolidge Defendants' Statement of Undisputed Material Facts. It was executed October 4, 1999 and the loan was sold on December 1, 1999 – more than a year after New Midland defaulted on the loan. It does have provisions in it which prohibit First Union from accepting reductions in principal or

32

settling the dispute prior to closing. Plaintiffs argue that this prevented New Midland from "paying off" the loan while the agreement was in effect. First of all, the loan closed shortly after the agreement was signed. Secondly, there was a sound business reason for Coolidge to insist that the value of the loan (whatever it was later determined to be) not be reduced before the loan could close. It was paying $4.5 million for the right to realize on that value and it did not want the value reduced.

The Plaintiffs also complain that the Loan Sale Agreement was negotiated in secret. The Plaintiffs cite no legal authority in support of their theory that this somehow constituted a conspiratorial act. No showing is made by Plaintiffs that a lender has a duty requiring it to tell a borrower that it is negotiating a sale of a loan. The Loan Sale Agreement also provides that First Union would cooperate with Coolidge if there was a foreclosure. There is nothing unusual about such an agreement.

Plaintiffs also make much of the fact that Coolidge's proposed plan of reorganization submitted in the Chapter 11 proceedings would have required dismissal of this litigation as a condition of confirmation. Plaintiffs argue that this evidenced conspiratorial conduct because:

> Coolidge was not a party to the Tennessee litigation at the time they [sic] filed that, their own plan of reorganization. The only reason to dismiss the Tennessee litigation would be to have another bite at the apple and try to eliminate the

33

> Blount County lawsuit against First Union. What interest
> could they possibly have, other than a concertive action with
> First Union, in dismissing the Tennessee litigation?

Transcript of Proceedings, October 1, 2003 at 90-91,

Coolidge had a sound business reason for wanting this litigation dismissed. Its

Loan Sales Agreement with First Union contained an indemnification agreement

whereby Coolidge was to reimburse First Union for the expense of this lawsuit after the

closing date unless such expense arose from the "wrongful acts" of First Union.

Exhibit G to Coolidge's Statement of Undisputed Material Facts. ¶ 9.

Plaintiffs have not presented direct evidence of any type of conspiratorial

agreement between First Union and Coolidge. As to circumstantial evidence, Plaintiffs

have not presented "specific admissible facts which realistically challenge" the stated

reasons for First Union's and Coolidge's business decisions. Lipman at *15. Thus the

conspiracy claim fails as a matter of law.

Finally, from a common sense point of view, these two creditors could not

"steal" the shopping center from Plaintiffs because: (1) the trustee on the deed of trust

had a duty to ensure a fair price was had if the property sold, (2) if it was worth

$9 million as asserted by the Plaintiffs, they could have refinanced it to pay off the

$5 million or so owed to Defendants, (3) New Midland could have bid in at any

foreclosure sale, (4) Defendants knew full well that Plaintiffs would seek Chapter 11

protection if foreclosure were threatened and the fairness of any sale wold be ensured by

34

the bankruptcy court, and (5) New Midland could have paid off the debt it owed and that would have ended the matter.

Where a claim is implausible, it is especially important that the non-moving party demonstrate specifically how a genuine issue of material fact exists. Matsushita, 475 U.S. at 552. Plaintiffs have failed to do so.[11]

### C. Count III, Breach of Contract – First Union

I am not going to spend a great deal of time on this issue; this Report is lengthy enough. The Plaintiffs allege that there was a breach of the loan agreement because First Union declared "the loan to have matured when it had not so matured and by diverting to itself New Midland's funds which had been earmarked for payment to the City of Alcoa, to Blount County and for structural and other capital improvements ...." Third Amended Complaint, Count III.

Plaintiffs' counsel conceded at oral argument, as he must, that if it were assumed that Mr. Fraimow did not make any fraudulent misrepresentations to Mr. O'Boyle or other of Plaintiffs' agents, then Plaintiffs must prove that First Union is estopped to rely on the September 30, 1998 event of default. Transcript of Proceedings, October 1, 2003

---

[11] Contrary to Plaintiffs' argument, the September 10, 2003 Special Master's Report did not validate or otherwise approve the merits of Plaintiffs' civil conspiracy claim. The issue there was Coolidge's claim that its conduct during the Chapter 11 proceedings was lawful or at least that res judicata barred relitigation of what occurred there and not the merits of the civil conspiracy claim. I said Coolidge's bankruptcy activities **may** be relevant and admissible on one prong of the civil conspiracy claim. Special Master's Report, September 10, 2003.

35

at 114-15. As indicated in Part III.A, the Plaintiffs cannot survive summary judgment on the fraudulent misrepresentation claim.

The question then becomes, is there a genuine issue of material fact with regard to the estoppel claim. The answer is clearly "no."

Under Tennessee law, there are several types of estoppel, including "equitable estoppel" (*estoppel in pais*), by deed, by record and judicial estoppel. See generally, 11 Tennessee Jurisprudence, Estoppel (1995). In this case, Plaintiffs seek to invoke equitable estoppel. Its elements are as follows:

> In order to constitute estoppel, there must have been a representation or concealment of material facts, the representation must have been made with knowledge, the party to whom it was made must have been ignorant of the truth, it must have been made with the intention that the other party should act on it and the other party must have been induced to act on it.

Id. § 27 (footnote deleted). This ground has been plowed earlier. See Part III.A. Plaintiffs simply have no basis for going forward with their claim that they were induced by First Union or Fraimow to believe that the Defendants did not mean exactly what was said in the June 8 letter, i.e. the loan is due in full September 30, 10998 and there will be no extensions.

This footnote appears at page 10 of Plaintiffs' Opposition to Defendant First Union's Motion for Summary Judgment.

> Tennessee law recognizes the broad concept of "quasi-estoppel." Werne v. Sanderson, 954 S.W.2d 742, 745 (Tenn.

36

Ct. App. 1997) (holding that court may apply judicial estoppel, a form of quasi-estoppel, without a finding of reliance or prejudice); Woods v. Woods, 638 S.W.2d 403, 406 (Tenn. Ct. App. 1982) (finding judicial estoppel to be a form of quasi-estoppel); Hamm v. Hamm, 204 S.W.2d 113, 119 (Tenn. Ct. App. 1947) (citing with approval to decisions of other states respecting quasi-estoppel). Judicial estoppel, like quasi-estoppel, does not require reliance and it is clear from the above cases that Tennessee recognizes those forms of estoppel not requiring reliance.

This is offered in support of Plaintiffs' argument that estoppel does not require proof of actual reliance by the harmed party. Cases from other jurisdictions are cited, but the Tennessee cases cited in the footnote, quoted just above, do not support Plaintiffs' equitable estoppel claim.

Werne and Woods involve judicial estoppel. That estoppel only applies where there has been perjury. Werne, 954 S.W.2d at 745. Hamm does not adopt quasi-estoppel doctrine nor does it cite "with approval to decisions of other states respecting quasi-estoppel."

Plaintiffs argue that First Union did not report the loan to its auditors and federal regulators in a timely manner after the September 30, 1998 default and this estops First Union from claiming a default on that date.

It does not appear that First Union had to report the loan as being on a non-accrual basis (default basis) until it did so at some time after January 15, 1999. The federal regulations provide that a loan is to be put on non-accrual basis and reported to federal regulators when is collection is "highly questionable" and "principal or interest is ninety

37

days or more past due, <u>unless the asset is well secured and in the process of collection.</u>"
Office of the Comptroller of the Currency Handbook, Exhibit M to Plaintiff's Opposition
to First Union's Motion for Summary Judgment (emphasis added). First Union's
decision not to put the loan on a non-accrual basis within the ninety-day period after the
September 30, 1998 default would seem to be justified by the fact that even according to
Plaintiffs' theory of the case the loan was well secured and there is no dispute that First
Union and New Midland tried to settle their differences for a period of time after the
September 30 default. This cannot be a basis for an estoppel.

Tennessee law is clear. Estoppels are not favored, 11 <u>Tennessee Jurisprudence:</u>
<u>Estoppel</u> § 2 (1995), and there must have been some misrepresentation or concealment of
material facts upon which the innocent party justifiably relied. That did not happen here.
New Midland breached the loan agreement when it defaulted on September 30, 1998. It
breached the contract first.

### D. Count IV – Breach of Fiduciary Duty – First Union

Count IV alleges that First Union breached a fiduciary duty owed to New Midland
in its capacity as a joint venturer with First Union in the ownership and operation of the
New Midland Plaza. Third Amended Complaint ¶ 56. This claim derives from the
fiduciary duty owed by one joint venturer to another and is premised on First Union's
alleged status as a joint venturer with New Midland in the ownership and operation of
the New Midland Plaza. A joint venture is an association of persons with intent, by way

38

of contract, express or implied, to engage in and carry out a single business adventure for joint profit. Fain v. O'Connell, 909 S.W.2d 790, 793 (Tenn. 1995). For a joint venture to exist, there must be some manner of agreement between the parties, an equal right on both to control both the venture as a whole and any relevant instrumentality. See Dewberry v. Maddox, 755 S.W.2d 50, 56 (Tenn. App. 1988).

There is no genuine issue of material fact which would allow submitting this issue to the jury. Express provisions of the Fourth Loan Modification Agreement preclude New Midland from asserting its status as a joint venturer with First Union. Paragraph 24 of the Fourth Loan Modification Agreement provides as follows:

> No Joint Venture. This Agreement shall not constitute a joint venture or partnership agreement of any kind between the parties hereto, or otherwise create the relationship of joint venturers or partners among the parties hereto. Nothing contained herein is intended to characterize or deem [the Bank] as a "mortgagee-in-possession," and [New Midland] hereby agrees that it shall not claim or assert anything to the contrary.

Exhibit 5 to First Union's Statement of Material Undisputed Facts. Clearly, this provision in the Fourth Loan Modification Agreement represents a mutual manifestation of the parties' intent that their relationship does not constitute a joint venture. This is a question of law for the Court and First Union is entitled to summary judgment in connection with this claim.

39

### E. Counts V and VI – Statutory Inducement of Breach of Contract Pursuant to Tenn. Code Anno. § 47-50-109 and Tortious Interference with Business Relationships

Counts V and VI of the Third Amended Complaint allege that the tenant notification letters induced tenants of New Midland Plaza to breach their leases by paying rents directly to First Union instead of to New Midland. As indicated in Part III.C, supra, New Midland defaulted on the note on September 30, 1998 and First Union was allowed to exercise its remedies under the Fourth Loan Modification Agreement. These remedies included the right to receive rents after New Midland's default pursuant to the Fourth Loan Modification Agreement ¶ 30.

The elements of a claim for statutory inducement of breach of contract or tortious interference with business relationships are: (1) the existence of a legal contract, (2) the wrongdoer must have known of the existence of the contract, (3) the wrongdoer must have intended to induce its breach, (4) the wrongdoer must have acted maliciously, (5) the contract must have been breached, (6) the act complained of must have been a proximate cause of the breach of contract, and (7) damages must have resulted from the breach. Tenn. Code Anno. § 47-50-109; Campbell v. Matlock, 749 S.W.2d 748, 751 (Tenn. App. 1987). The primary difference between the two causes of action is that the statutory provision permits treble damages while the common law action allows punitive damages. In this case, there is no evidence that the tenants breached their leases because First Union, by operation of paragraph 30 of the Fourth Loan Modification Agreement

40

assumed the status as landlord entitled to receive tenant rents for spaces leased at the New Midland Plaza. There is no allegation by New Midland that the tenant notification letters caused the tenants not to pay their rents under their respective leases and no breach of the leases occurred.

For these reasons, the Defendants are entitled to summary judgment in connection with the claims set forth in Counts V and VI.

### F.  Count VII – Conversion, First Union and Coolidge

The Plaintiffs allege that First Union and Coolidge have received rents and other payments collected from tenants of the property which they have unlawfully withheld from New Midland, the owner of the property, and which properly belong to New Midland.

As indicated above, it was New Midland that breached the loan agreement. There is no evidence that First Union and Coolidge have exceeded their authority under the loan documents with respect receiving rents and other payments collected from tenants of the property. First Union and Coolidge are entitled to summary judgment in connection with the claim set forth in Court VII of the Third Amended Complaint.

### G.  Count VIII – Breach of Implied-in-Law Contract – First Union

Count VIII purports to plead a personal claim by Mr. O'Boyle under Florida common law for breach of an implied-in-law contract with First Union. The allegation is that First Union provided third parties, including Coolidge, access to Mr. O'Boyle's

41

financial and banking information maintained by First Union without first obtaining

Mr. O'Boyle's private authorization. Third Amended Complaint ¶ 78. Defendant

Marshall Allan has testified in his deposition that he requested that First Union produce

its credit file in connection with Coolidge's due diligence in deciding whether or not to

buy the loan in question. He testified that Mr. O'Boyle's personal financial information

was not in the files. Deposition of Coolidge by Defendant Allan taken January 22, 2002

at page 225. Mr. Allan explained what he was looking for in the credit files of First

Union:

> [I was] looking for information specific to the property such as appraisals, environmental reports, loan documents, modifications to the loan, default letters, litigation financial statements, that type of information.
>
> Q. Financial statements of whom?
>
> A. Financial statements of the property. Financial statements of the borrower.
>
> Q. Did you care at all about Mr. O'Boyle's personal financial information?
>
> A. It was not in the files.
>
> Q. You didn't see it in the files?
>
> A. I did not see it in the files.
>
> Q. Okay. Were you looking for it?
>
> A. I was doing a review of the files. I did not see it.

42

Q. No. Did you specifically request of First Union Mr. O'Boyle's personal financial information?

A. No.

Q. And what they produced to you you didn't see – you don't recall seeing it in there?

A. That's correct.

Deposition of Coolidge by Defendant Allen taken January 22, 2002 at 225-26

(objections and breaks omitted).

Exhibit C to Coolidge's Motion for Summary Judgment as to the Disclosure of

Confidential Financial Information is the Affidavit of Fred Stahl dated April 9, 2003.

That Affidavit states as follows:

1. I am a defendant in the this [sic] lawsuit and I, along with Marshall Allan, am responsible for the day to day affairs of [Coolidge], another defendant in this lawsuit.

2. I went to the offices of First Union's attorneys, Klehr, Harrison, Harvey, Branzburg & Ellers in Philadelphia with Mr. Allan and one of our attorneys, Schuyler Carroll of the New York law firm of Olshan, Grundman, Frome, Rosenzweig & Walosky and was allowed to review the files related to [sentence ends].

3. Mr. Allan and I reviewed all of the files provided to us by First Union, while Mr. Carroll reviewed files we referred to him. I did not see any documents from or to any banking regulators respecting the New Midland loan, nor did I see any documents which revealed Mr. O'Boyle's personal financial information. Therefore, Mr. Carroll did not see any such documents either.

43

See also Mr. Allan's Affidavit, Exhibit B to Coolidge's Motion for Summary Judgment as to Disclosure of Confidential Information. The testimony in this record is undisputed that when Coolidge personnel reviewed First Union's credit file, they did not see any of O'Boyle's personal information.

Even if there were some factual support for the Plaintiffs' contention, the claim fails as a matter of law. Mr. O'Boyle has attempted to sue upon an implied contract theory. Florida law requires that to state a claim for breach of implied contract, the defendant must have been "unjustly enriched" by a benefit conferred by the plaintiff. See Commerce Partnership 8098 Limited Partnership v. Equity Contracting Co., 695 So.2d 383, 386 (Fla. 4th Dist. C. App. 1997). There is no evidence that O'Boyle conferred any benefit upon the Defendants that unjustly enriched them. Furthermore, under Florida law, disclosure of information concerning a depositor's account is permissible (1) under compulsion of law, (2) pursuant to the public interest, (3) pursuant to the bank's interest, or (4) when made with the expressed or implied consent of the customer. Barnett Bank of West Florida v. Hooper, 498 So.2d 923, 925 (Fla. 1986). Even had there been a disclosure, it would have been in First Union's interest.

For the reasons indicated, there are no genuine issues of material fact and First Union is entitled to judgment as a matter of law in connection with the claim set forth in Count VIII of the Third Amended Complaint.

44

## IV. Recommendations

For the reasons indicated above, it is recommended that the following motions be granted:

1. The motion filed by First Union to dismiss/for summary judgment in connection with the Third Amended Complaint;

2. The motion filed by Coolidge seeking partial summary judgment regarding the alleged confidential financial information concerning Mr. O'Boyle;

3. First Union and Defendant Fraimow's motion for summary judgment with respect to all claims asserted by Plaintiffs in this lawsuit; and

4. Coolidge's motion for partial summary judgment as to the conspiracy claim.

Respectfully Submitted,

Dated: October 22, 2003

Robert P. Murrian, Special Master, BPR 000866
Suite 2500, First Tennessee Plaza
P.O. Box 629
Knoxville, Tennessee 37901-0629
Phone:      (865) 525-5134
Fax:         (865) 522-5723

Of Counsel:
KRAMER, RAYSON, LEAKE, RODGERS
   & MORGAN, L.L.P.

I hereby certify that the within is a true
Copy of the original filed in this court.

Clerk & Master

45

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of the foregoing Special Master's Report has been served this _22nd_ day of _October_ , 2003, upon all counsel or parties as listed below at interest in this cause by delivering a true and exact copy to the offices of said counsel or parties or by placing a copy in the United States mail addressed to said counsel or parties at his/her office, with sufficient postage to carry it to its destination, or by special overnight courier.

Ross Cooper, Esq.
Shulman, Rogers, Gandal,
   Pordy & Ecker, P.A.
11921 Rockville Park, 3rd Floor
Rockville, MD 20852

David T. Black, Esq.
Kizer & Black
329 Cates Street
Maryville, TN 37801

John A. Lucas, Esq.
James S. Chase, Esq.
Hunton & Williams
900 S. Gay Street, Suite 2000
P.O. Box 951
Knoxville, TN 37901-0951

Larry Hutcher, Esq.
Davidoff & Malito, LLP
605 Third Ave., 34th Floor
New York, New York 10158

Thomas S. Scott, Esq.
Christopher T. Cain, Esq.
Ball & Scott
550 W. Main Avenue
Knoxville, TN 3790

Charles Van Beke Esq.
Wagner, Myers & Sanger, P.C.
1801 First Tennessee Plaza
Knoxville, TN 37929

Robert P. Murrian

46