## IN THE CIRCUIT COURT FOR BLOUNT COUNTY, TENNESSEE
## EQUITY DIVISION

NEW MIDLAND PLAZA ASSOCIATES,　　　　　)
a Tennessee General Partnership,　　　　　　)
MARTIN E. O'BOYLE, CATHERINE O'BOYLE,　)
SUCCESSOR TO JOHN E. O'BOYLE, and　　　)
CATHERINE O'BOYLE as tenants by the　　　)
entireties, COMMERCE PARTNERSHIP NO. 1147,　)
a Florida General Partnership, and COMMERCE　)
PARTNERSHIP NO. 1171, a Florida　　　　　)
General Partnership,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)　Civil Action No. E-18053
　　　　　　Plaintiffs,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
vs.　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
FIRST UNION NATIONAL BANK,　　　　　　)
ALCOA CALDERWOOD, LLC　　　　　　　)
(F/K/A COOLIDGE SOMERSET ALCOA, LLC,　)
DAVID FRAIMOW, MARSHALL ALLEN, and　)
FRED STAHL,　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　Defendants.　　　　　　　　)

FILED
SEP 22 2005
JAMES A. CARROLL
CLERK &
MASTER

### FINAL REPORT OF SPECIAL MASTER J. MICHAEL WINCHESTER

COMES J. MICHAEL WINCHESTER ("**Special Master**"), and herewith reports, files, and submits his final report, findings of fact, and conclusions of law (collectively the "**Final Report**"), pursuant to the Order of Reference entered in this matter by this Honorable Court. This Special Master has previously submitted a Preliminary Report and three (3) Supplements thereto, as well as Revised Scheduling Orders, to which specific reference is hereby made for incorporation herein by reference along with this Final Report (collectively the "**Report**"). Any conclusions, rulings, stipulations, and findings set forth in said Preliminary Reports and Supplements thereto, along with the definitions and descriptions contained therein, are adopted



EXHIBIT
I

and incorporated herein by reference into this Final Report as the context may require unless otherwise noted herein.

## I. GENERAL MATTERS, STATUS, AND PROCEDURE
### A. FINAL HEARING

This Special Master has convened and concluded a final hearing (the **"Final Hearing"**) on the Attorney's Fees Claims asserted by Alcoa Calderwood, LLC (**"Alcoa"**) pursuant to the Attorney's Fees Provisions as previously defined and identified in the Preliminary Report and Supplements thereto submitted in this matter. The Final Hearing was held on July 28, 2005, and July 29, 2005, in the Circuit Courtroom of this Honorable Court, at which time this Special Master considered and reviewed the Petition to Determine Amount and Reasonableness of Fees filed by Alcoa on February 18, 2005 (the **"Petition"**), the Affidavits of various persons submitted in support thereof, as revised and/or amended (collectively the **"Affidavits"**), exhibits submitted by both parties in support of their respective positions on the Attorney's Fees Claims (the **"Exhibits"**), and the Memorandum Briefs and Submissions of said parties, as well as stipulations and the testimony of witnesses in an open courtroom.

At the close of the proof submitted by the parties, and after hearing closing statements and arguments of legal counsel for each party, this Special Master ordered and allowed Alcoa to submit its additional Attorney's Fees Claims for fees and expenses incurred through the date of the Final Hearing on or before August 1, 2005 (see Exhibit 242). The Plaintiff, NEW MIDLAND PLAZA ASSOCIATES (**"New Midland"**), was permitted to file objections to any such supplemental fee request on or before August 3, 2005 (see Exhibit 243). The parties have also submitted a transcript of the proceedings at the Final Hearing (the **"Final Hearing Transcript"**), said Final Hearing Transcript being filed separately herewith and being incorporated herein by reference for all purposes along with a separate Notice of Filing.

References to the record and Exhibits at the Final Hearing shall be indicated by referring to "Transcript at pages(s) _____ to _____" or to Exhibit Numbers as "Exhibit No(s). _____", unless otherwise noted. An Exhibit List and original Exhibit Nos. 1-243 have been filed with the Court simultaneously herewith pursuant to a separate Notice of Filing.

## B. MOTIONS IN LIMINE

Pursuant to the Revised Scheduling Order described below, the parties were permitted to file Motions in Limine and Deposition Excerpts by stated deadlines. Both parties timely filed Motions in Limine (collectively the "**Motions in Limine**") identified herein. This Special Master heard the Motions and made decisions and findings stated herein for reasons described in the Final Hearing Transcript, EXCEPT that the rulings on the request by Alcoa for imposition of a "default rate of interest" on the Loan Amount Due and Attorney's Fees Claims were reserved and taken under advisement by this Special Master. This Final Report contains this Special Master's findings of fact and conclusions of law relating to the default rate of interest issues as stated herein.

## C. TELEPHONIC HEARING ON JUNE 20, 2005

Pursuant to agreement of the parties, this Special Master convened a telephonic hearing on June 10, 2005, to consider pending matters and revising the Revised Scheduling Order to set a Final Hearing date on the Attorney's Fees Claims. For various reasons, a Final Hearing on the Attorney's Fees Claims has been reset and continued on several occasions, requiring that the Order of Reference entered by this Honorable Court be indefinitely extended to accommodate the schedules of the parties and their legal counsel. Due to medical complications suffered by Martin O'Boyle, a principal of New Midland, the prior dates for a Final Hearing scheduled on May 17, 2005, and May 18, 2005, were postponed indefinitely.

As a result of the hearing on June 20, 2005, this Special Master ordered and directed that a Final Hearing be held on the Attorney's Fees Claims beginning July 28, 2005, and continuing to July 29, 2005, if necessary. A transcript of the telephonic hearing (the "**Telephone Transcript**") was prepared or is now attached hereto and filed in Tab 9. As stated in said Telephone Transcript, this Special Master determined from the arguments of legal counsel for the parties and from the record as a whole, that further delays in proceeding to a Final Hearing on the Attorney's Fees Claims would be prejudicial to Alcoa, and that the grounds for further delays or continuances asserted by New Midland were not well-taken and were otherwise without merit to justify further delays. Based on these findings and conclusions, this Special Master issued the following rulings and further modified and amended the Revised Scheduling Order as follows:

(1) <u>Motions in Limine/Objections Thereto</u> – any Motions in Limine and/or Objections thereto not previously filed with the Special Master and the Court must be filed and served on the Special Master on or before Friday, July 15, 2005;

(2) <u>Exhibit List</u> – The parties shall jointly file an Exhibit List and all exhibits to be submitted at the Final Hearing with the Court and served upon the Special Master by Monday, July 18, 2005. This Exhibit List shall contain a consecutive numerical listing of all Exhibits to be submitted by the parties with any stipulations and/or objections thereto being so noted therein; and

(3) <u>Final Hearing</u> – A Final Hearing in this matter shall be set to convene at 9:00 a.m. local time on July 28, 2005 and continuing until July 29, 2005, if necessary.

## II. RULINGS ON MOTIONS IN LIMINE AND OBJECTIONS

As stated above and in the Third Supplement filed April 19, 2005, this Special Master ruled on the Motions in Limine and/or Objections thereto filed by the parties hereto prior to proceeding with the Final Hearing on July 28, 2005. Accordingly, this Special Master hereby **concludes, directs, finds,** and **reports** the following rulings on said Motions and recommends that this Honorable Court enter an appropriate Order to confirm this Special Master's rulings on said Motions as follows:

A.  <u>Alcoa's Motion to Limit Scope of Hearing</u> – This particular Motion was filed by Alcoa on or about July 15, 2005. New Midland filed a Response to this Motion and Alcoa subsequently filed its Reply. This Motion is GRANTED in part for the reasons stated at the time of the Final Hearing (see Transcript at pages 9-34), except the portion relating to the Default Rate of Interest on Attorney's Fees Claims which is DENIED for the reasons stated herein.

B.  <u>Alcoa's Motion to Prohibit Testimony of Martin O'Boyle</u> – This Motion was filed by Alcoa on or about July 15, 2005 seeking to exclude testimony of Martin O'Boyle. New Midland filed its Response to said Motion on or about July 26, 2005. For the reasons stated at the Final Hearing, this Motion is GRANTED in part to the extent that Mr. O'Boyle may only testify on factual matters relating to whether or not attorney's fees and expenses incurred by Alcoa were reasonable and necessary (see Transcript at pages 82-85) (NOTE: The Special Master considers this particular issue and Motion moot since Mr. O'Boyle was not presented as a witness at the Final Hearing).

C.  <u>Alcoa's Objections to Designated Testimony</u> – Alcoa filed Objections to designated deposition testimony of Fred Stahl (**"Stahl"**) set forth in Exhibit M to New

Midland's Prehearing Memorandum served May 4, 2005. For the reasons stated at the Final Hearing, Alcoa's Objections will be either GRANTED in part and/or DENIED in part if and when deposition testimony of Mr. Stahl is presented as proof in the Final Hearing (see Transcript at pages 85-88).

D.    New Midland's Motion to Exclude Testimony and Evidence – New Midland filed this Motion and Alcoa filed its Omnibus Response thereto on July 22, 2005. For the reasons stated at the time of the Final Hearing, this Motion is DENIED (see Transcript at pages 21-24).

E.    New Midland's Motion to Exclude Testimony and Evidence for Lack of Categorization – This particular Motion was filed by New Midland dated July 15, 2005, for which Alcoa has filed a portion of it's Omnibus Response dated July 22, 2005. For the reasons stated at the Final Hearing, this Motion is DENIED (see Transcript at pages 88-91).

F.    New Midland's Motion to Exclude Expert Testimony – This Motion was filed by New Midland on or about July 15, 2005. A portion of the Omnibus Response of Alcoa relates to this Motion and was filed July 22, 2005. For the reasons stated at the Final Hearing, this Motion is GRANTED and no expert testimony on the reasonableness on the attorney's fees may be submitted by Alcoa, except that the Affidavits of John Lucas will be excepted from this ruling (see Transcript at pages 91-96).

G.    New Midland's Motion to Exclude Documents submitted after February 18, 2005 – This particular Motion was filed by New Midland on or about July 15, 2005 for which a portion of the Omnibus Response was submitted on July 22, 2005 by Alcoa.

For the reasons stated at the time of the Final Hearing in this matter, this Motion is DENIED (see Transcript at pages 24-28, 98).

H.    Motion for Default Rate of Interest on Attorney's Fees Claims – As part of Alcoa's Submission filed January 25, 2005, and in it's Petition, Alcoa has asserted its position to be paid a default rate of interest on it's Attorney's Fees Claims. Further, Alcoa has requested a recommendation from this Special Master that the "default rate of interest will begin to run from the date the fees were incurred, that is, the date billed to Alcoa." (see Petition at page 2, paragraph 1). New Midland has vehemently opposed this position on applying a default rate of interest (or any rate of interest) on the Attorney's Fees Claims asserted by Alcoa in relevant portions of the Responses, Memoranda, Motions, and argument during all phases of these proceedings. For the reasons stated at the time of the Final Hearing in this matter, Alcoa's request for a default rate of interest on its Attorney's Fees Claims is DENIED (see Transcript at pages 16-17, 36-60, and 67-68). Further, certain portions of this Final Report containing findings of facts and conclusions of law on the applicable interest rate on the principal balance of Loan Amount Due and the Attorney's Fees Claims (see Section III, paragraph H. and I.), are specifically referred to and incorporated herein by reference as additional bases for this ruling.

## III.  FINDINGS OF FACT AND CONCLUSIONS OF LAW AT FINAL HEARING PRE-HEARING RULINGS

The Order of Reference to this Special Master, as amended, specifically grants authority to determine the amount of any and all attorney's fees, if any, owing by New Midland to Alcoa. Further, this Special Master was ordered, authorized, and directed to conduct an investigation to determine all Attorney's Fees Issues including, but not limited to, whether such fees and related

costs were "both reasonable and necessary" (see Order filed February 9, 2005 modifying original Order of Reference filed March 14, 2003). To the extent that this Special Master has heretofore determined findings of fact and conclusions of law in his Preliminary Report, and supplements thereto, all such findings of fact and conclusions of law are specifically referred to and incorporated herein by reference. Since both parties have submitted Submissions, Briefs, and Argument in the context of and as part of the Final Hearing in this matter, this Special Master believes it is appropriate to restate and reference the following prior findings and conclusions on the Attorney's Fees Claims from his previous Reports and Supplements as follows:

(1)     The recovery of those portions of the Attorney's Fees Claims asserted by Alcoa relating to court reporter's fees, expert witness fees, and fees for the services of Special Masters (including Special Master Murrian and this Special Master), is controlled by Rule 54.04 of the Tennessee Rules of Civil Procedure (TRCP). As stated in Rule 54.04(1), court costs shall be prepared by the clerk and shall be allowed to the prevailing party, which is Alcoa in this case. Discretionary costs such as court reporter expenses, expert witness fees, and other "discretionary costs" are also recoverable if they are both reasonable and necessary, and if a Motion requesting such discretionary cost is filed and served after entry of judgment pursuant to TRCP 54.04(2). This Special Master has previously recommended and reported that all discretionary costs in the Bank Litigation should be allowed to Alcoa and should be considered and included as part of the Attorney's Fees Claims recovered by Alcoa for all purposes (see First Supplement to Report filed on February 17, 2005, at pages 31-32). The fees and expenses of a Special Master are also controlled by this provision as recently discussed and approved by the Tennessee Court of Appeals in the case of _Johnson vs. Houston_, 30 TAM 5-18, dated December 30, 2004. Except to the extent that this Special Master has submitted his own fees and expenses to legal counsel for

Alcoa and New Midland for payment, this Special Master reports and recommends that all court reporter fees, Special Master fees, and expert witness fees claimed by Alcoa in the Bank Litigation be approved by this Honorable Court as both reasonable and necessary, and that such amounts are proper to include under the Attorney's Fees Provisions and Attorney's Fees Categories previously identified in the Preliminary Report, as amended. The specific findings and conclusions as to the amounts of such fees and expenses will be set forth below;

(2) The findings and conclusions of this Special Master relating to the Additional Document Production by Alcoa and the timeliness of the filing of all discovery and disclosure documents to supplement its Legal Expense Document Production Requirements by Alcoa are hereby restated and confirmed by this Special Master, and any assertion of a defense of *laches* or other legal theory by New Midland on whether or not Alcoa has complied with orders of this Special Master or previous Special Masters, to make a "full disclosure" are hereby OVERRULED (also see Second Supplement to Report filed March 11, 2005, at pages 5-7);

(3) As a Supplement to this Special Master's findings and conclusions contained on page 5 of his Second Supplement to Report filed March 11, 2005, this Special Master FINDS, CONCLUDES, and REPORTS that the Petition filed by Alcoa to recover its Attorney's Fees Claims, as supplemented by the Affidavits and certifications filed March 14, 2005, and April 27, 2005, along with the Affidavits in support thereof, establish a *prima facia* claim and reasonable description of all Attorney's Fees Claims asserted by Alcoa. Further, any objections by New Midland in any submission, response, Motion, and/or argument during these proceedings relating to reasonableness of descriptions of legal fees and expenses are hereby OVERRULED and DENIED; and

(4)     All evidentiary rulings, findings, and conclusions stated in the Final Hearing Transcript that are not specifically listed in this Report are hereby referenced and incorporated herein and are included as part of this Special Master's Report and Recommendation for approval by this Court pursuant to further Order.

## FINAL HEARING RULINGS

A.     *Attorney's Fees Claims of Olshan Firm*.  As part of its Petition filed as of February 18, 2005, Alcoa submitted total Attorney's Fees Claims of $1,540,554.00 (exclusive of interest) that included a request for recovery of fees involving the law firm of Olshan, Grundman, Frome, Rosenzweig & Wolosky, LLP (the **"Olshan Firm"**) in the amount of $101,425.00 (see prior Exhibit 21A to the Petition; also see Exhibit 50 at Final Hearing and Exhibit 223).  Since the fees of the Olshan firm were original asserted as part of the Attorney's Fees Claims, this Special Master hereby FINDS, CONCLUDES, RECOMMENDS and REPORTS to this Honorable Court as follows:

(i)     The Olshan Firm represented Alcoa in portions of calendar years 1999 and 2000.  In particular, the Olshan Firm was asked to give advice concerning the purchase of the original New Midland Loan dated March 29, 1988, as subsequently modified and extended. Further, advice was rendered by the Olshan Firm to Alcoa on the likelihood of approval of the plan of reorganization presented by New Midland in its bankruptcy proceedings (see Exhibit 152);

(ii)     On or about March 17, 2000, Alcoa filed a Chapter 11 bankruptcy Petition in the Southern District of New York and was represented by the Olshan Firm.  The Petitions and Schedules filed by Alcoa list fees owing to the Olshan Firm as $184,000.00;

(iii)     Alcoa subsequently hired the Olshan Firm to represent it in a lawsuit against First Union for fraud in connection with the purchase of the New Midland Loan, such Complaint being filed March 19, 2001 (see Exhibit 151);

(iv)     On or about April 25, 2000, in connection with the Alcoa bankruptcy proceedings, a Supplemental Affidavit of Disinterest was filed by Robert E. Grossman on behalf of the Olshan Firm that states in pertinent part that the fees of the Olshan Firm are WAIVED as a pre-petition claim against Alcoa (see Exhibit 160);

(v)     Alcoa subsequently filed a Complaint against the Olshan Firm for malpractice on or about October 25, 2002 (see Exhibit 174);

(vi)     During the testimony of Charles Van Beke at the Final Hearing, legal counsel for New Midland cross-examined Mr. Van Beke on the original request for recovery of the Olshan Firm fees and expenses as part of the Petition. Mr. Van Beke testified that he was not aware of the waiver of those fees at the time of submission of the Petition;

(vii)     On or about February 28, 2005, Alcoa filed a Response to New Midland's objections to the Petition, wherein Alcoa withdrew all claims for recovery of attorney's fees involving the Olshan Firm (see Alcoa Response at page 14);

(viii)     As part of its revised filing of its Attorney's Fees Claims, Alcoa has deleted the claim of $101,425.00 related to the Olshan Firm (see Exhibit 1); and

(ix)     Based on the foregoing, this Special Master FINDS, CONCLUDES, and REPORTS that any claim by Alcoa for recovery of its Attorney's Fees Claims relating to the Olshan Firm should be DENIED in its entirety; further, the original request by Alcoa for recovery of these fees was not made in bad faith by Alcoa and was promptly withdrawn upon discovery of the waiver.

B.    _Attorney's Fees Claims of Gunster Firm_.  In relation to the attempts by Alcoa to recover its Attorney's Fees Claims relating to the law firm of Gunster, Yoakley, Valdes-Fauli & Stewart, or its successors and predecessors in interest (the **"Gunster Firm"**), this Special Master FINDS, CONCLUDES, RECOMMENDS and REPORTS as follows:

(i)    Alcoa asserts the right to recover Attorney's Fees and expenses incurred through the Gunster Firm in the amount of $136,379.00.  In addition to this amount, Alcoa asserts that it is entitled to recover $21,235.00 for disbursements paid directly by Alcoa for court reporter fees and expenses paid directly by Alcoa in connection with representation by the Gunster Firm (see Transcript at page 95).  These fees, expenses, and disbursements are itemized in the original Petition filed by Alcoa and in various exhibits presented at the Final Hearing (see Exhibit 1, as revised);

(ii)    The Gunster Firm provided invoices for attorney's fees and expenses incurred from December of 1999 through February of 2000, pursuant to Affidavit of Hugh William Perry (see Exhibit 16).  The individual invoices for professional services allegedly incurred on behalf of Alcoa by the Gunster Firm have been submitted as part of the record in these proceedings (see Exhibit 13);

(iii)    During the testimony of Peter H. Levitt, Esq. (**"Levitt"**) at the Final Hearing, it was established that the Gunster Firm was legal counsel to Alcoa in various legal proceedings including the New Midland bankruptcy proceeding and during the negotiation and closing of the Loan Sale Agreement between First Union and Alcoa on November 30, 1999;

(iv)    Mr. Levitt further testified on cross-examination from legal counsel for New Midland that the Gunster fees had not been paid, but that the Gunster Firm expected that such fees and expenses would be paid in due course by Alcoa;

12

(v)     Deposition testimony from Mr. Stahl obtained March 25, 2005, was read into proof at the time of the Final Hearing, without objection. In his deposition testimony, Mr. Stahl testified that he was not satisfied with the results that Alcoa had obtained through the Gunster Firm's representation. While Mr. Stahl stated that he intended to pay the Gunster Firm, he also stated that he did not want to pay them at that time, even though there were proceeds available to Alcoa to pay a portion of the Gunster Firm attorney's fees;

(vi)    During the bankruptcy proceedings involving Alcoa, the Bankruptcy Petition filed on behalf of Alcoa listed the Attorney's Fees Claims of the Gunster Firm as "disputed" on March 17, 2000 (see Exhibit 141);

(vii)   On cross-examination, Larry Hutcher, Esq. ("**Hutcher**") testified that during a previous deposition (not submitted as an exhibit) in November of 2002, Mr. Stahl testified that the Gunster Firm was owed $25,000.00. There was no explanation or clarification as to the significant difference in the amounts allegedly owed by Alcoa to the Gunster Firm;

(viii)  New Midland has consistently argued throughout these proceedings that the portion of the Attorney's Fees Claims asserted by Alcoa should not include fees and expenses of the Gunster Firm for numerous reasons, including the fact that the fees were listed as disputed in Alcoa's bankruptcy proceedings. New Midland also argues that the facts and circumstances of this case indicate that Alcoa does not intend to pay the Gunster Firm based on the significant passage of time from incurring the fees and expenses and the failure of Alcoa to pay such fees even though funds were available for that purpose. Finally, New Midland contends that the fees and expenses of the Gunster Firm were redundant and that the services rendered were ineffective in the representation of Alcoa; therefore, New Midland contends that such fees and expenses were not reasonable and necessary;

(ix)    This Special Master has reviewed the itemization of Attorney's Fees Claims by Alcoa relating to the Gunster Firm, including the letter of Mr. Perry dated February 2, 2000, to Mr. Stahl regarding payment of invoices and that the Gunster Firm would have no continuing role in the bankruptcy proceedings involving New Midland (see last page of Exhibit 13);

(x)    A review of the Gunster Firm invoices indicates that there are many entries relating to research on various issues in the New Midland Bankruptcy Proceeding relating to the confirmation hearing in January of 2000. Included in these invoices are itemizations of disbursements by the Gunster Firm for various court costs and expenses actually advanced by the Gunster Firm for the benefit of Alcoa (see Exhibit 13 at pages 15 and 16). It would also appear that Alcoa has made direct payments and disbursements for certain court reporter fees and expenses in the amount of $21,235.00 as set forth in Exhibit 1, as revised;

(xi)    Many entries in the Gunster Firm invoices are generic and make reference to "Settlement" without further explanation or reference from the context and chronology of the invoices. The Special Master CONCLUDES that some of the fees and expenses of the Gunster Firm related to dealings with First Union or other legal matters involving Alcoa do not fall within the Attorney's Fees Categories approved by this Special Master (see First Supplement to Report filed February 17, 2005). Since there was no testimony offered at the Final Hearing on any of these issues by an authorized representative of the Gunster Firm, any explanation of the fees of the Gunster Firm were limited to the testimony of Mr. Levitt;

(xii)    In order to determine whether attorney's fees are reasonable and necessary, the Special Master is required to look at the facts and circumstances of each case (see, e.g. *Alexander vs. Inman*, 974 S.W.2d (Tenn. Ct. App. 1995). In addition to a determination of

14

the particular facts of each case, the reasonableness of attorney's fees must be viewed in relation to ethical considerations of Rule 1.5 of the Rules of Professional Conduct as guidelines (see *White vs. McBride*, 937 S.W.2d 796 (Tenn. Sup. Ct. 1996);

(xiii)   While expert testimony is not needed on general value of legal services, it is left within sound judicial discretion based on a court's knowledge of facts and circumstances of a particular case to determine the reasonableness of Attorney's Fees Claims, including a claim based on a contractual Attorney's Fees Provision.  (See *Preston Lincoln-Mercury, Inc. vs. Kilgore*, 525 S.W.2d 155 (Tenn. Ct. App. 1974);

(xiv)   Even in cases where an Attorney's Fees Provision is contained as part of a contract or indemnity agreement, the reasonableness of Attorney's Fees Claims are within the sound discretion of the trial court in light of all relevant circumstances. (See *Ideal Electronic Security Co., Inc. vs. International Fidelity Insurance Company*, 129 F.3d 143 (U.S. App. DC Cir. 1997);

(xv)   This Special Master has compared the time entries and work performed by the Adorno & Yoss, LLP, firm (the **"Adorno Firm"**) with the invoices submitted by the Gunster Firm to determine if there is overlap, redundancy and/or excessive fees based on repetitious work performed by multiple firms.  This Special Master FINDS and CONCLUDES that there appears to be very limited overlap based on both the chronological events and time periods for which legal services were provided to Alcoa by these firms.  It also appears from the testimony and documents provided by Mr. Levitt that the Adorno Firm represented Alcoa primarily in the New Midland Bankruptcy Proceedings from calendar year 2001 forward (see Exhibit 11 at page 2, paragraph 7).  Further, Mr. Levitt was a prior shareholder in a firm that merged with the Gunster Firm until 1998, when he joined the Adorno Firm; therefore, Mr. Levitt could not testify from

firsthand knowledge as to the reasonableness of fees and expenses incurred by the Gunster Firm during calendar years 1999 and 2000 (see Exhibit 11, at page 2, paragraph 4); and

(xvi)    This Special Master FINDS and CONCLUDES that the conduct of Alcoa in relation to the invoices of the Gunster Firm provide at least some evidence that Alcoa does not, and did not, believe that the Gunster Firm fees and expenses were "reasonable and necessary". The fact that Alcoa listed the Gunster Firm fees as "disputed" in its bankruptcy proceeding has not been explained or contradicted, but has instead been supported by the fact that Alcoa has not paid the Gunster fees for approximately five (5) years. The fact that the Gunster bills contain references to representation of Alcoa that do not appear to fall within the previously approved Attorney's Fees Categories reduces the analysis by this Special Master to "guesswork" as to what portion, if any, of the Gunster Firm's fees and expenses would be recoverable under the New Midland Loan documents following the Loan Sale Agreement. Based on all of the facts and circumstances presented to this Special Master during the preliminary hearings and at the time of the Final Hearing, this Special Master FINDS, CONCLUDES, RECOMMENDS, and REPORTS that the Attorney's Fees Claims asserted by Alcoa relating to the Gunster Firm should be DENIED, except for the following amounts which may be recovered by Alcoa as part of its Attorney's Fees Claims:

(a)    Disbursements paid directly by Alcoa in the amount of $21,235.00 for court reporter fees and other out-of-pocket expenses (see Exhibit 13, last two (2) pages); and

(b)    Disbursements for court costs and expenses actually paid and properly documented by the Gunster Firm as part of Exhibit 13 in the amount of $8,834.83, except to the extent that such amount includes disbursements paid directly by Alcoa stated above.

Accordingly, this Special Master hereby finds, concludes, and reports that Alcoa should recover the above expenses under Category 3 of the Attorney's Fees Categories and that such costs and expenses were reasonable and necessary under the facts and circumstances of this case.

C.   *Attorney's Fees Claims of Adorno & Yoss Firm*.  The Petition filed by Alcoa to recover its Attorney's Fees Claims include significant fees relating to services rendered and expenses incurred by the law firm of Adorno & Yoss, formerly known as Adorno & Zeder (the **"Adorno Firm"**).  In connection with this portion of the Attorney's Fees Claims of Alcoa, this Special Master FINDS, CONCLUDES, RECOMMENDS, and REPORTS to this Honorable Court as follows:

(i)   The Adorno Firm has submitted through Alcoa its Attorney's Fees Claims in the total amount of $116,636.00 (see Exhibit 1) plus its supplemental fees and costs as stated in additional filings submitted by Alcoa for the total amount of $133,545.24 (see revised Exhibit 12) as part of Exhibit 242;

(ii)   Alcoa presented its Attorney's Fees Claims for the Adorno Firm through the Affidavit of Mr. Levitt, as amended (see Exhibit 11), and through the submission of itemized invoices for fees and expenses incurred from April of 2001 through August of 2005 (see Exhibit 12);

(iii)   Mr. Levitt's testimony at the Final Hearing, both on direct and in cross-examination, included references to fees that were deducted from his time entries for "attorney's liens" issues and for document production preparation in the New Midland Bankruptcy Proceedings that did not involve litigation.  Mr. Levitt testified that he had made attempts to deduct such fees from his attorney's fees statements that were tendered as part of the Final Hearing in this matter;

(iv)    By letter of April 14, 2000, Mr. Levitt provided a letter to Alcoa concerning a "fee cap" arrangement that was discussed in detail at the Final Hearing (see Exhibit 169). Included in this testimony and in the exhibits were references to a $60,000.00 payment by shareholders of Alcoa during a period of time that Alcoa was in a Chapter 11 bankruptcy proceeding. Reference was also made to the summary of attorney's fees and expenses paid by Alcoa in relation to the New Midland matters (see Exhibit 223). Mr. Levitt also testified about payments of $10,000.00 from a trust account at the law firm of Wagner, Myer & Sanger (the "**Wagner Firm**") that was apparently paid sometime in December of 2003 (see Exhibit 179);

(v)    Mr. Levitt testified that litigation of issues concerning the preparation of loan documents became apparent and necessary following the receipt of a letter of January 13, 2003, from legal counsel for New Midland stating that issues involving the loan documents to be signed by New Midland would "have to be resolved by the Bankruptcy Court" (see Exhibit 38). The disputes between Alcoa and New Midland involving the preparation, negotiation, and execution of amended loan documents in the New Midland Bankruptcy Proceedings have been discussed and documented throughout the proceedings before this Special Master and in various exhibits and documents submitted in connection herewith (see, e.g. Exhibits 20, 21, 22, 28, 36, 80, 81, and 82);

(vi)    As part of this Record, the transcript of a hearing before the Bankruptcy Court on November 3, 2004, involving the approval of loan documents contains a statement by Bankruptcy Judge Hyman to the effect that it has taken these parties four and a half years to prepare loan documents and clear disputes and that much of their efforts involving expert witnesses and litigation was a "waste of money" (see Bankruptcy Court Transcript, Exhibit 36 at pages 33 and 34);

(vii)    Pursuant to Bankruptcy Court Orders entered November 6, 2003, and January 2, 2004, Bankruptcy Judge Hyman previously ruled that there would be no Attorney's Fees Provisions or recovery of fees for negotiating and drafting an Intercreditor Agreement (see Exhibits 20 and 241);

(viii)    As the result of the Bankruptcy Court proceedings, Attorney's Fees Provisions are now contained in the Amended Deed of Trust (Exhibit 22) and Deed of Trust Note (Exhibit 21) that have been itemized for comparison purposes in relation to the original Note and Deed of Trust (see Exhibit 23). The original Note and original Trust Deed were amended by order of Bankruptcy Judge Hyman on November 12, 2004 (see Exhibit 105) and do not contain identical provisions to the new Note and new Trust Deed as indicated in Exhibit 23. For example, the original Note contained a provision that required the "Maker" (New Midland) to reimburse the "Holder" for fees and expenses incurred by the Holder in connection with the "preparation, administration, amendment, modification, or enforcement of this Note"; however, this identical language was not approved or incorporated into the new Deed of Trust Note (Exhibit 21);

(ix)    Accordingly, this Special Master has previously ruled that Attorney's Fees Claims asserted by Alcoa for either defending its rights under its loan documents in New Midland's Bankruptcy Proceedings and/or reopening New Midland's Bankruptcy Proceedings involving the loan documents would not include any portion of such Attorney's Fees Claims relating to "preparation, administration, amendment, or modification of the loan documents" (see First Supplement to Report filed February 17, 2005 at page 28). Based on this prior finding, Mr. Levitt testified that he had redacted fees and expenses that would be excluded by prior rulings of

the Bankruptcy Court Judge or this Special Master from his billing statements as incorporated into his Affidavit and submissions (see Exhibits 11 and 12, as revised);

(x)     During the course of Mr. Levitt's tesitmony, reference was made to a summary of all Alcoa fee payments based on the New Midland matters (see Exhibit 223). Based on a review of this material, it would appear that the Adorno Firm has received payments from Alcoa between the dates of May 2000 and December 2004 of in excess of $209,000.00. This Special Master has not been able to reconcile the difference in payments provided in the summary of Exhibit 223 and the summaries provided by the Adorno Firm in Exhibits 11 and 12, as revised. Mr. Levitt testified that Exhibit 223 did not include all payments by Alcoa to Levitt, such testimony being elicited in cross-examination by Mr. Van Beke (Transcript at pages 373 - 374);

(xi)     To add to some of the confusion involving the fees paid by Alcoa to the Adorno Firm, the Alcoa Bankruptcy Petition filed March 17, 2000, indicates that the amount due to the Adorno Firm at that time was $45,000.00 (see Exhibit 141). It appears to this Special Master that some of the confusion relates to the fact that the exhibits relating to Alcoa's payments to all attorneys (Exhibit 223) does not coincide with the same time periods for such payments provided by the Adorno Firm through Mr. Levitt's testimony and exhibits. Further, some of the confusion of the amounts paid and/or owed to the Adorno Firm relates to the complications caused by the "fee cap" arrangement described in the exhibits and testimony (see pages of Exhibits 11 and 12, as revised);

(xii)     It was also submitted into proof at the Final Hearing that the Adorno Firm had represented Alcoa in litigation against First Union evidenced by a Complaint filed March 19, 2001 (see Exhibit 151). This Special Master FINDS, CONCLUDES, and REPORTS that any

fees incurred by Alcoa in connection with litigation with First Union would not be properly recoverable by Alcoa against New Midland based on the Attorney's Fees Categories previously approved and reported by this Special Master;

(xiii)   Mr. Levitt was also asked to identify attorney's fees, invoices, and statements submitted on behalf of the Gunster Firm (see Exhibit 13). Mr. Levitt admitted that he was not associated with the Gunster Firm in calendar year 1999 or thereafter. Mr. Levitt further testified that he was not personally familiar with the litigation between Alcoa and the Olshan Firm, nor would he offer his opinion or recollection as to whether the Gunster Firm agreed with the advice provided to Alcoa by the Olshan Firm. Based on this testimony and a review of all exhibits provided through Mr. Levitt's testimony, this Special Master FINDS, CONCLUDES, and REPORTS that the legal representation of Alcoa by the Gunster Firm, Olshan Firm, and Adorno Firm necessarily involve some redundancy and overlapping of work performed on behalf of Alcoa, including review of prior documents, pleadings, and work in the New Midland bankruptcy proceedings by different firms at different times to "get up to speed" on the status of such proceedings;

(xiv)   Mr. Levitt did not know any reasons as to why the Gunster Firm fees had not been paid by Alcoa when funds were available for that purpose in the Spring of 2005. Mr. Levitt testified that the Adorno Firm was still representing Alcoa in various matters and he speculated that Alcoa was paying attorneys who were "still working" for Alcoa, rather than paying older bills of the firms no longer actively working for Alcoa (such as the Gunster Firm);

(xv)   During the course of Mr. Levitt's testimony, reference was made to portions of the deposition of Mr. Stahl on March 25, 2005 (see Exhibit 176). There was also

21

reference to the deposition of Mr. Stahl of November 4, 2002, involving negotiations to reduce or forego fees payable by Alcoa (no exhibit provided);

(xvi) The "fee cap arrangement" between the Adorno Firm and Alcoa was discussed during a significant portion of Mr. Levitt's testimony. It was the understanding of this Special Master from Mr. Levitt's testimony that the Adorno Firm was not seeking recovery of attorney's fees beyond the fee cap arrangement even though they contended that case law might support such a recovery. The fee cap was increased from $10,000.00 to $25,000.00 sometime in calendar year 2003. If the fee cap arrangement is properly understood by this Special Master, the total Attorney's Fees Claims of the Adorno Firm would be reduced from $133,545.24 to $101,419.24 (see Exhibits 12 and 242, revised summaries);

(xvii) The fee cap arrangement between the Adorno Firm and Alcoa is also documented in a letter of December 23, 2003 (see Exhibit 179). Alcoa confirmed this fee arrangement by paying $10,000.00 on the bill dated December 2, 2003, issued by the Adorno Firm. This $10,000.00 payment is also cross-referenced and confirmed as an entry in Exhibit 223. Mr. Levitt testified that the fee cap arrangement ended in July 2004, and that hourly rates were charged by the Adorno Firm to Alcoa from that point forward;

(xviii) By letter of August 19, 2004, Mr. Levitt advised the principals of Alcoa of additional legal matters that would require his firm's attention and of a change in the fee arrangements. This letter recites that a fixed fee basis would no longer apply and that the fee cap for "excess fees" have not been charged to Alcoa Calderwood (see Exhibit 177). Mr. Levitt's letter and testimony confirms that his firm will continue to document "excess fees" to permit Alcoa to seek recovery for such fees from New Midland through a foreclosure even though "Alcoa has no obligation to seek to recover its attorney's fees from New Midland" (see Exhibit

22

177, page 2). The new fee arrangement further confirms that if Alcoa does seek to recover the excess fees, the Adorno Firm would expect to be reimbursed for such excess fees, less a reasonable allocation of Alcoa's litigation expenses in achieving the recovery;

(xix)  This Special Master does not believe that the revised fee arrangement between the Adorno Firm and Alcoa as set forth in the letter of August 19, 2004, contains an improper or unethical fee arrangement based on information contained in the Record; however, this Special Master FINDS, CONCLUDES, and REPORTS that the facts and circumstances involving the fee cap arrangement between the Adorno Firm and Alcoa establish the standard for determining what was "reasonable and necessary" in regard to attorney's fees for the legal representation of Alcoa in this matter during those relevant time periods;

(xx)  This Special Master further FINDS, CONCLUDES, and REPORTS that New Midland is entitled to the reduction of Attorney's Fees Claims to the extent of the benefit provided by the fee cap arrangement, especially since no proof was provided to the Special Master on a "reasonable allocation of litigation expenses" to recover the "excess fees" alleged by the Adorno Firm. Further, from the testimony of Mr. Levitt, it was apparent to the Special Master that the Adorno Firm continues to enjoy the representation of Alcoa in other unrelated matters that provided an obvious inducement to the Adorno Firm to accommodate Alcoa with the "fee cap" arrangement in the first place;

(xxi)  Based on the legal standards previously referenced in this Report, and from the record as a whole, this Special Master FINDS, CONCLUDES, and REPORTS that the portion of the Attorney's Fees Claims of Alcoa related to the Adorno Firm as set forth in revised Exhibit 12 (and Exhibit 242) should be reduced and adjusted, and that the amount of $90,000.00

would be reasonable and necessary attorney's fees and expenses to be recovered by Alcoa as part of its Attorney's Fees Claims;

(xxii) Further, this Special Master FINDS, CONCLUDES, and REPORTS that the fees and services performed by the Adorno Firm as itemized in this Record, fall within the Attorney's Fees Categories previously permitted by the Special Master as properly recoverable by Alcoa for its Attorney's Fees Claims; specifically, Alcoa's fees incurred in defending its rights under its loan documents in New Midland's Bankruptcy Proceedings (Category 3), Alcoa's fees incurred in defending the State Court litigation (Category 4), and Alcoa's fees incurred in re-opening New Midland's Bankruptcy Proceedings to litigate the terms of the loan documents (Category 5);

(xxiii) This Special Master has reviewed the allegations and defenses asserted by New Midland to the Adorno Fees to the extent that they involve "unauthorized payments" by or on behalf of Alcoa while it was in a Chapter 11 bankruptcy proceeding. By letter of April 14, 2000, the Adorno Firm requested a $60,000.00 payment to be made by the shareholders or affiliates of Alcoa to pursue certain matters on appeal, but that such payments should not be made by Alcoa as "unauthorized payments" to its attorneys (see Exhibit 169). Based on the testimony of Mr. Levitt and the Record as a whole, this Special Master does not believe that the $60,000.00 payment is relevant for determination by this Special Master since it does not appear that Alcoa is seeking reimbursement or otherwise attempting to charge New Midland for the $60,000.00 payment even though a $60,000.00 charge appears on Exhibit 223;

(xxiv) While the exhibits and/or Record produced during these proceedings appear to be somewhat inconclusive on the $60,000.00 payment issue, it is this Special Master's understanding that such amounts for Bankruptcy Court Appeals by Alcoa in the New Midland

24

Bankruptcy Proceedings have not been asserted by Alcoa as part of its Attorney's Fees Claims. Accordingly, this Special Master does not believe that additional deductions from the Adorno Firm are necessary or appropriate based on this finding; however, if the Special Master is incorrect in this conclusion, and it is established to this Honorable Court that the Attorney's Fees Claims by Alcoa include amounts attributable to appeals filed by Alcoa in the New Midland Bankruptcy proceedings, it is this Special Master's CONCLUSION, RECOMMENDATION, and REPORT that such fees should not be recovered by Alcoa since such amounts are not properly included under the Attorney's Fees Categories approved by this Special Master;

(xxv)  To the extent that Mr. Levitt or his firm charged fees relating to the Trust Deed Release (Exhibit 240) or for title review and issues associated therewith, this Special Master FINDS, CONCLUDES, and REPORTS that such attorney's fees and expenses should be recoverable by Alcoa as part of its Attorney's Fees Claims and that such fees and expenses are reasonable and necessary costs under the facts and circumstances of this case; and

(xxvi)  Mr. Levitt also testified that he was involved in the employment of Jeffrey Wall, Esq. (**"Wall"**) as an "expert witness in the New Midland Bankruptcy Proceedings (Transcript at pages 389 - 392). The fees and statements for Mr. Wall have been submitted as Exhibit 4 to these proceedings. This Special Master FINDS, CONCLUDES, and REPORTS that it was reasonable and necessary for Alcoa to hire Mr. Wall as an expert witness in the New Midland Bankruptcy Proceedings. Further, the fees and expenses claimed by Mr. Wall are reasonable and necessary costs under the facts and circumstances of this case. This Special Master has previously determined that the recovery of expert witness fees are controlled by TRCP 54.04, but these expenses were not incurred as part of the Bank Litigation. The expert

witness fees of Mr. Wall fall within approved Attorney's Fees Categories incurred by Alcoa in these proceedings, and should be recovered by Alcoa without compliance with TRCP 54.04(2).

     D.    *Attorney's Fees Claims of Davidoff, Malito & Hutcher Firm.* As part of its Petition, Alcoa has also asserted a portion of its Attorney's Fees Claims based on services provided and fees incurred by the Davidoff, Malito & Hutcher firm ("**Davidoff Firm**"). This Special Master hereby FINDS, CONCLUDES, RECOMMENDS, AND REPORTS the following in relation to the Attorney's Fees Claims of Alcoa involving the Davidoff Firm:

     (i)    The fees of the Davidoff Firm were supported by the Affidavit of Larry Hutcher and the invoices and fee statements of the Davidoff Firm submitted as part of the proof at the Final Hearing (see Exhibits 8 and 9). The total fees and expenses claimed by the Davidoff Firm at the time of the Petition were $488,926.00 (see Exhibit 1). These amounts were supplemented by later filings, whereby the fees and expenses claimed by Alcoa for the Davidoff Firm were revised and updated for a total claim of $552,139.04 (see revised Exhibit 9 and Exhibit 242);

     (ii)    The submission of Attorney's Fees Claims attributable to the Davidoff Firm has already been reduced by "Fees Not Claimed" in the amount of $70,137.50" and should be further reduced by $55,491.00 for loan document negotiation and an additional $9,945.50 for settlement matters as itemized in revised Exhibit 9. Based on these reductions, the total amount of the Attorney's Fees Claims of Alcoa attributable to the Davidoff Firm is $486,702.54;

     (iii)    At the Final Hearing, the testimony of Mr. Hutcher was offered by Alcoa on the issue of fees due the Davidoff Firm. Mr. Hutcher testified that his fees excluded work relating to Florida Bankruptcy appeals. Mr. Hutcher further testified that he was not "corporate

or inside counsel" for Alcoa during any of the litigation matters or proceedings during his representation of Alcoa (Transcript at pages 431 - 432);

(iv)    During cross-examination, New Midland suggested that the Davidoff Firm was performing duplicative work in Tennessee at "New York rates" that were unreasonable for the Bank Litigation in Tennessee. Mr. Hutcher responded by testifying on cross-examination that he was an attorney with thirty (30) years experience in similar litigation and that his fees were low for New York standards. Further, he testified that his firm became involved with the Wagner Firm in November 2001 to help "level the playing field" with New Midland based on the fact that New Midland had retained multiple law firms in several states, including Pennsylvania, Tennessee, and Florida (Transcript at pages 439 - 443;

(v)    On the issue of redundancy or duplication of fees incurred by Alcoa in the Tennessee Bank Litigation and New Midland Bankruptcy Proceedings, Mr. Hutcher testified that he helped coordinate the complex litigation that was ongoing in three (3) separate jurisdictions and that his efforts were reasonable and necessary to provide efficient and competent legal services and support to Alcoa and its local counsel in all jurisdictions in which litigation was pending (Transcript at pages 427-431);

(vi)    This Special Master has reviewed the exhibits tendered by both parties in these proceedings on the fees and expenses of the Davidoff Firm, including Exhibit 182 submitted by New Midland. Based on the review of the Record, this Special Master FINDS, CONCLUDES, and REPORTS that there was no improper or excessive duplication of effort or redundancy in the billing statements presented by the Davidoff Firm, Wagner Firm, and/or Adorno Firm (except as previously stated) that would require further reduction based on "reasonable and necessary" costs and expenses on the Attorney's Fees Claims of Alcoa. Further,

this Special Master FINDS, CONCLUDES, and REPORTS that the complexity of the litigation in multiple jurisdictions required some overlapping and redundancy by these law firms in order to effectively coordinate their efforts in multiple jurisdictions;

(vii)     Based on all facts and circumstances known to this Special Master involving these proceedings and the legal authority cited above, the portion of Attorney's Fees Claims incurred by Alcoa in relation to the Davidoff Firm is reasonable and necessary and should be recoverable by Alcoa as part of its Attorney's Fees Claims;

(viii)   This Special Master finds it significant that there was no cross-examination by New Midland relating to any specific items charged by the Davidoff Firm that were allegedly excessive or redundant. This Special Master has reviewed the Davidoff Firm billing statements and does hereby FIND, CONCLUDE, and REPORT that the rates, costs, and expenses disclosed therein were reasonable and necessary for the Bank Litigation under the circumstances of this case;

(ix)     In the context of this particular portion of the Attorney's Fees Claims, this Special Master FINDS, CONCLUDES, and REPORTS that Tennessee law and procedure permits the submission of Affidavits regarding services, invoices, rates, and practices to establish a *prima facia* case for attorney's fees. The Affidavits should also detail the hourly rate charged and that such rates are similar for lawyers situated and involved in similar matters. Upon such submission, such evidence is sufficient to shift the burden of going forward to the party opposing the fees to demonstrate how the requested fees were unreasonable. See *Hosier vs. Crye Leike Commercial, Inc.*, 2001 WL 799740 at page 7 (Tenn. Ct. App. 2001);

(x)     Further, a trial court may determine the fees and expenses with or without expert testimony and, in the absence of proof on the issue of reasonableness, it is incumbent

upon the party challenging the fees to pursue correction of any errors by pointing out the specifics of the improper fees. See *Kline vs. Kline*, 69 S.W.3d 197, 210 (Tenn. Sup. Ct. 2002);

(xi)    New Midland presented no proof or cross-examination testimony that would demonstrate that any fees asserted by the Davidoff Firm were unreasonable. Further New Midland's Brief and Memorandum in support of its position relies on numerous federal cases setting forth a "lode star" approach based on multiplying compensable hours times hourly rates. This Special Master FINDS, CONCLUDES, and REPORTS, that a fixed mathematical rule for determining a reasonable attorney's fee is not the law in this jurisdiction and would not be appropriate to apply in a complex case involving multiple litigation pending in multiple states. See *Killingsworth vs. Ted Russell Ford, Inc.*, 104 S.W.3d 530 (Tenn. Ct. App. 2002);

(xii)    Alcoa has produced hundreds of pages of exhibits and documents in its Petition, Responses, and Certifications filed February 18, 2005, March 14, 2005, April 27, 2005, and during the course of the Final Hearing. This document production has provided reasonable detail and descriptions of all legal fees, costs, and expenses incurred by Alcoa to allow New Midland a fair and reasonable opportunity to pursue discovery and cross-examination of witnesses supporting the Attorney's Fees Claims asserted by Alcoa. This Special Master has agreed to numerous extensions of time to allow New Midland to conduct discovery, depose witnesses, review documents, and prepare its case for defending against the Attorney's Fees Claims asserted by Alcoa. Accordingly, any defenses or claims by New Midland that they were denied procedural due process rights or a "fair hearing" are without merit and are not supported by the facts, circumstances, and evidence produced in these proceedings. Reference is made to Exhibit 50 for a summation of documents produced by Alcoa in support of its Attorney's Fees Claims as well as the numerous exhibits referenced herein;

(xiii)   In support of his legal conclusions and recommendations in this matter, this Special Master has reviewed multiple cases cited by the parties, including the case of _Brian A., et al vs. Hattaway, et al_, 83 Fed. Appx. 692 (6th Cir. 2003). This case is attached as Exhibit B to Exhibit 242 submitted by Alcoa.  The _Hattaway_ case supports the position that out-of-state legal counsel may be paid attorney's fees based on billing rates prevalent in the out-of-state area, rather than in the jurisdiction of the pending litigation.  Further, the Sixth Circuit determined that it is not sufficient for defendants to simply argue that an overall fee is excessive without objecting to particular time entries.  As stated above, New Midland did not cross-examine Mr. Hutcher on any specific time entries contained in the Davidoff Firm billing statements and otherwise offered no proof to contradict Mr. Hutcher's Affidavits or testimony; and

(xiv)   Accordingly, based on the testimony and proof submitted in the form of exhibits and the Record as a whole, this Special Master FINDS, CONCLUDES, and REPORTS that the Attorney's Fees Claims asserted by Alcoa relating to the Davidoff Firm are reasonable and necessary to the extent of $486,702.54 and are properly includable in the Attorney's Fees Categories previously approved by the Special Master, including Categories 3, 4, and 5 discussed herein.

E.      _Attorney's Fees Claims of Wagner, Myer & Sanger Firm_.

(i)      The Attorney's Fees Claims asserted by Alcoa relating to the Wagner Firm were originally submitted in the amount of $678,542.00 (original Exhibit 21A dated 2/18/05) and revised at the time of the Final Hearing up to the amount of $825,661.00 (see Exhibit 1).  By later supplement, the total claim for fees and expenses by Alcoa relating to the Wagner Firm were $884,284.52 (see Exhibit 242 and revised Exhibit 3 summary) exclusive of fees not claimed and loan document negotiation;

(ii)    The testimony of Mr. Van Beke was offered as part of the proof by Alcoa for recovery of the Wagner Firm fees and expenses. This proof included reference to various exhibits submitted by Mr. Van Beke and the Wagner Firm (see Exhibits 2, 3, 5, 6, 7, and 242). These exhibits and testimony indicated that the Wagner Firm had previously deleted amounts excluded from recovery by this Special Master and established the hourly rates charged by the Wagner Firm and its partners and associates;

(iii)    The hourly rates charged by the Wagner Firm are significantly lower that the attorney's fees rates previously approved by this Honorable Court for attorneys representing First Union in prior discovery disputes involved in contempt of court proceedings and recovery of cost (see Exhibits 44-48). Accordingly, this Special Master FINDS, CONCLUDES, and REPORTS that the attorney's fees, rates, and expenses asserted by the Wagner Firm are reasonable and necessary based on the facts and circumstances of this particular case. Furthermore, after a review of the details provided by Alcoa for fees and expenses incurred through the Wagner Firm, this Special Master, FINDS, CONCLUDES, and REPORTS that all attorney's fees and expenses claimed by the Wagner Firm relate to Attorney's Fees Categories previously approved by this Special Master, including specifically Category 4 (fees incurred in defending the Bank litigation);

(iv)    In calculating the fees and expenses of Alcoa relating to the Wagner Firm, this Special Master has reviewed the summary of Wagner Firm fees provided as a chart under Exhibit 3, as revised (see Exhibit 242). This Special Master has disallowed $580.00 for loan documents and has **not** included $8,594.50 for fees and expenses in connection with claims against Allan and Stahl that have been itemized separately in the Summary. (See Transcript at page 478 and Exhibit 242 Summary). Further, this Special Master has made separate

determinations as to payments and/or expenses related to expert witnesses, Special Masters, and court reporters as stated elsewhere in this Report, even though such fees and expenses from time to time appear in Affidavits and submissions for the Wagner Firm. Based on the revised Exhibit 3 submitted by Alcoa as part of Exhibit 242, this Special Master FINDS, CONCLUDES, and REPORTS that this Honorable Court should approve and permit the recovery of $884,284.52 incurred by Alcoa for legal fees and expenses through the Wagner Firm;

(v)     On the issues and defenses asserted by New Midland involving redundancy and repetition of services by the different law firms representing Alcoa, Mr. Van Beke's testimony was clear and uncontradicted that his firm was not charging for repetitious work related to other proceedings. Further, Mr. Van Beke testified that the Davidoff Firm was performing some oversight and monitoring of the multi-state litigation between these parties, but that he did not consider Mr. Hutcher to be "inside counsel" or "corporate counsel" for purposes of any fee arrangements or the division of responsibilities between the law firm (Transcript at pages 472 - 477). Further, Mr. Van Beke submitted Exhibit 242 updating the fees and expenses of all law firms representing Alcoa. In response thereto, New Midland has submitted Exhibit 243 that does not challenge any specific payment, entry, or expense claimed by Alcoa (see Exhibit 243). Rather, New Midland argues that the Release (Exhibit 240) excluded any further fees claimed by Alcoa from and after March 16, 2005. This Special Master's ruling on this specific claim of New Midland is set forth in a separate section herein;

(vi)    The court reporter expenses in the amount of $6,484.00 incurred by Alcoa (see Exhibits 1 and 6) should be allowed as discretionary costs per TRCP 54.04(2); and

(vii)   To the extent that Allen and Stahl incurred fees and expenses directly associated with the Bank Litigation in the amount of $8,594.50, this Special Master FINDS,

RECOMMENDS and REPORTS that such amounts are **not** properly included in the Attorney's Fees Categories previously approved by this Special Master and should not be recovered by Alcoa since there was no proof on how these fees and costs were calculated or recoverable under the Attorney's Fees Provisions, and Alcoa's obligation to provide a legal defense (or indemnification) for these parties was not presented or explained in the Record. However, as parties to the Bank Litigation, Allen and Stahl should be entitled to recover their court reporter fees and costs pursuant to TRCP 54.04, and this Special Master RECOMMENDS and REPORTS this conclusion as part of this Report.

F.   *New Midland's Claim and Defense of Release of Attorney's Fees Claims*. As part of Exhibit 243, New Midland filed a Response dated August 3, 2005, that basically asserted that the Trust Deed Release (Exhibit 240) executed by Alcoa eliminated the bases for the assertion of any additional Attorney's Fees Claims and expenses by Alcoa from and after March 18, 2005. Alcoa vehemently denies this defense and position of New Midland. Based on a review of the records in this matter, including a transcript of the hearing before this Honorable Court on March 3, 2005, this Special Master FINDS, CONCLUDES, and REPORTS the following:

(i)   The Release executed and delivered by Alcoa dated March 18, 2005, states that it "releases, satisfies, extinguishes, and cancels the released documents and fully releases and discharges the "Mortgaged Property" as described therein (see Exhibit 240, page 3);

(ii)   At the Final Hearing, there was extensive argument by legal counsel for the parties on the transactions and circumstances that resulted in the execution and delivery of the Release (see Transcript at pages 557-566). The facts and circumstances that formed the basis for the execution of the Release arise from the hearing before this Honorable Court on March 3, 2005. A Transcript of the hearing on March 3, 2005, has been provided to this Special Master

for his review in connection with these issues. Based on a review of this Transcript, this Special Master FINDS, CONCLUDES, and REPORTS that the position taken by New Midland is not well-taken and should be DENIED for the reasons stated herein;

(iii) The transcript of the March 3, 2005, hearing clearly records that New Midland wanted to "fully secure" Alcoa so that it would receive every penny it might get (see page 10, line 16). Further, when Alcoa requested security for its ongoing attorney's fees, New Midland's counsel responded by saying that the Note and Trust Deed "are paid", but that if the Special Master finds additional amounts due, New Midland will pay it (see page 25, line 20);

(iv) In relation to the Release, this Special Master FINDS, CONCLUDES and REPORTS that the transcript of the March 3, 2005, hearing before this Honorable Court establishes that New Midland proposed to pay the amounts that this Special Master might decide were due to Alcoa even though the Note and Trust Deed would be "extinguished" (page 35 at lines 2-7; also see page 37, line 4); and

(v) This Special Master is aware that this Honorable Court entered an Order of March 16, 2005, confirming the agreement of the parties pursuant to the March 3, 2005, transcript. The Special Master CONCLUDES from the entire Record that the execution and delivery of the Release has not extinguished Alcoa's rights to assert its Attorney's Fees Claims; rather, this Special Master FINDS, CONCLUDES, and REPORTS that the fund of $1,540,559.00 paid into the Registry of this Court was intended as substitute collateral and/or proceeds of the mortgage represented by the Deed of Trust that was released by Alcoa and that the Attorney's Fees Claims of Alcoa attached to the funds now held in the Registry of this Court. Further, this Special Master is not aware of any facts or circumstances submitted into evidence in these proceedings which would establish that it was the intent of the parties to release or

extinguish the Attorney's Fees Claims as the result of the execution and delivery of the Release. However, whether or not the March 3rd Agreement and Court Order of March 16, 2005, extinguished or released further Attorney's Fees Claims of Alcoa is an issue that this Honorable Court may be in the best position to determine since the Order of Reference does not include authority to review such matters.

G. *Submission of Exhibits into Evidence.* At the time of the Final Hearing, this Special Master permitted legal counsel for the parties to submit additional exhibits into evidence for purposes of establishing the Record. To the extent that objections were timely made by the parties, this Special Master ruled on such objections at the time of the Final Hearing, to which rulings specific reference is hereby made. Accordingly, this Special Master FINDS, CONCLUDES, and REPORTS that the exhibits referenced in this Report were accepted into evidence and considered by this Special Master for all purposes, subject to relevance and weight as determined by this Special Master.

H. *Interest on Principal Balance of Loan Amount Due.* Pursuant to his Preliminary Report filed February 8, 2005, this Special Master determined the Loan Amount Due as of January 20, 2005, to be the amount of $4,890,647.67 (see Preliminary Report at page 14). The Maturity Date for the Amended Note (Exhibit 21) was previously determined to be January 20, 2005. The amount and applicable interest rate for payments of the Loan Amount Due is currently outstanding and unresolved by and between the parties. On the rate and amount of interest due and owing to Alcoa on the Loan Amount Due, this Special Master FINDS, CONCLUDES, and REPORTS as follows:

(i) The Loan Amount Due as determined by the Special Master in his Preliminary Report was not paid by New Midland on the Maturity Date of January 20, 2005;

rather, the amount of $4,890,647.67 was not paid by New Midland until on or about March 18, 2005 (see Affidavit of Levitt attached as Exhibit D to Alcoa's Motion to Limit Scope of Hearing filed July 15, 2005). Alcoa contends that there was an undisputed Event of Default on the New Midland Loan Documents at least as of January 20, 2005, that entitled Alcoa to a "default rate of interest" that was not paid on or about March 18, 2005, as part of the Loan Amount Due (see Exhibit 21, page 5). The calculation of the additional amount claimed by Alcoa on the Loan Amount Due based on the default rate of interest is set forth in Exhibit F to Alcoa's Motion to Limit Scope of Discovery filed July 15, 2005 (also see Exhibit 68). The amount sought by Alcoa through August 16, 2005, for the unpaid amount of interest at the default rate on the Loan Amount Due is $73,573.51;

(ii) In its Response to this request, New Midland states that there was a "on demand" requirement for the accrual of default rate interest to begin on applicable attorney's fees (see Exhibit 21, page 6) and costs. New Midland also asserts that there was no "demand" until December 2004. The time of a demand by Alcoa has been established and admitted to be no earlier than December 15, 2004 (see Transcript at page 457);

(iii) Further, New Midland states that Alcoa is not entitled to a default rate of interest on the Loan Amount Due because Alcoa failed to provide a proper payoff request to New Midland in December 2004 and at other material times prior to the Maturity Date. Basically, New Midland claims that the issue of the amount of attorney's fees claimed by Alcoa prevented New Midland from tendering a payoff proposal to resolve the claims asserted by Alcoa secured by the Amended Deed of Trust (see Exhibits 91, 92, 120, and 127). In summary, New Midland contends that it should not be required to pay a default rate of interest since Alcoa could not provide it with a proper payoff amount to calculate interest through a date certain;

36

(iv)     A review of the Transcript of the February 2, 2005, Preliminary Hearing held by this Special Master reveals that the calculation of the Loan Amount Due as of January 20, 2005, has been established from at least that date forward (see Transcript of February 2, 2005, hearing at page 87). At the First Meeting of the parties on January 20, 2005, there was a specific discussion about the fact that default provisions would be triggered if a payoff was not tendered as of January 20, 2005 (see Transcript of January 20, 2005, First Meeting at page 53). Further, legal counsel for New Midland stated that they were capable of tendering the full amount due on the New Midland Loan at that time (see Transcript of January 20, 2005, First Meeting at page 58);

(v)     At the time of the Final Hearing, legal counsel for Alcoa asserted that the amount of $73,573.51 could be determined to be owing to Alcoa as a matter of law. A spreadsheet was presented and discussed (attached as Exhibit 68 and Exhibit F to the Motion to Exclude Testimony previously identified); and

(vi)     Based on all of the foregoing, this Special Master FINDS, CONCLUDES, and REPORTS that Alcoa is entitled to a default rate of interest in the amount set forth in Exhibit 68 in the amount of $73,573.51 through and including August 16, 2005, and this Special Master recommends that this Court enter an Order assessing such amount against the funds paid into the Registry of this Court as part of the determination of the "Loan Amount Due" in this proceeding.

I.     *Interest on Attorney's Fees Claims*. Alcoa has asserted that it is entitled to a default rate of interest on its Attorney's Fees Claims based on the Attorney's Fees Provisions contained in the New Midland Loan documents (see Exhibits 21 and 22). After a review of the entire Record in this matter, including all evidence, testimony, and exhibits submitted at the Final Hearing, and after a review of applicable case law on the determination of attorney's fees

and expenses under Tennessee law, this Special Master FINDS, CONCLUDES, and REPORTS as follows:

(i)     Alcoa did not make a demand for attorney's fees from New Midland before December 2004. Legal counsel for Alcoa admitted at the time of the Final Hearing that there was no declaration of default until such time as a default letter was sent December 15, 2004 (see Exhibits 39, 40, and 94; also see Transcript at pages 39 and 40);

(ii)     New Midland contends that the amount of the demand for attorney's fees and costs was never determined in a definite calculation that allowed it to assess the propriety of paying attorney's fees and costs as part of a payoff amount. The claim for attorney's fees and costs by Alcoa range from $2,088,000.00 (see Exhibit 94 and 97), but then increased to $2,973,637.00 pursuant to an updated claim for attorney's fees dated January 25, 2005 (see Exhibit 120);

(iii)     At the time of the Final Hearing in this matter, this Special Master previously ruled that a default rate of interest on the Attorney's Fees Claims asserted by Alcoa would not be permitted for reasons stated at the hearing (see Transcript at pages 66-70). Accordingly, this Special Master FINDS, CONCLUDES, REPORTS, and CONFIRMS that a default rate of interest should not be allowed on the Attorney's Fees Claims asserted by Alcoa;

(iv)     Further, based on the fact that there was a legitimate dispute as to the amount of the Attorney's Fees Claims to which Alcoa was entitled under the Attorney's Fees Provisions, this Special Master FINDS, CONCLUDES, and REPORTS that New Midland was justified in refusing to pay or tender payment on the Attorney's Fees Claims asserted by Alcoa at or about the time of the Maturity Date on January 20, 2005, but not the principal balance of the Loan Amount Due. The Attorney's Fees Claims asserted by Alcoa in its initial request (Exhibit

38

120) dated January 25, 2005, included attorney's fees for various categories that were not proper or allowable under the Attorney's Fees Provisions (see Exhibit 23). As stated in this Final Report, this Special Master has again further reduced the amounts of the Attorney's Fees Claims by Alcoa relating to the Gunster Firm, Adorno Firm, and the Olshan Firm. The Attorney's Fees Issues in the matters referred to this Special Master have been complicated by multi-state litigation, zealous advocacy, and the participation of multiple firms throughout both the Bank Litigation and the Bankruptcy Proceedings. Every aspect of the Attorney's Fees Issues have been hotly contested and extensive exhibits, briefs, and discoveries have been undertaken for over six (6) months to resolve these issues; and

> (v)     Based on the foregoing, and the Record as a whole, this Special Master FINDS, CONCLUDES, RECOMMENDS and REPORTS that this Honorable Court DENY any interest on the Attorney's Fees Claims asserted by Alcoa based on all the facts and circumstances of this case. The previous citations to applicable law and authority on determination of "reasonable attorney's fees" are referred to and incorporated herein by reference in support of this finding and conclusion, and this Special Master recommends that this Honorable Court enter an Order confirming these findings and conclusions.

## IV.  SUMMARY AND CONCLUSION

Based on the foregoing, this Special Master has now submitted and filed his Final Report along with a separate Notice of Filing Transcript and Notice of Filing Exhibit List and Exhibits on this the 22nd day of September, 2005. In summary, this Special Master REPORTS and RECOMMENDS that this Honorable Court enter an Order confirming the terms and provisions of this Final Report, as well as the prior Preliminary Report and Supplements thereto, for recovery of Attorney's Fees Claims by Alcoa, as follows:

## SUMMARY OF ATTORNEY'S FEES CLAIMS

|  | *Amount requested* | *Allowed amount* |
|---|---|---|
| Olshan Firm | $ 101,425.00 | -0- |
| Gunster Firm | $ 136,379.00 | $ 8,834.83 |
| Alcoa payments (direct) | $ 21,235.00 | $ 21,235.00 |
| Adorno Firm | $ 133,545.24 | $ 90,000.00 * |
| Jeffrey Wall, Esq. | $ 16,133.00 | $ 16,133.00 |
| Davidoff Firm | $ 552,139.04 | $ 486,702.54 |
| Wagner Firm | $ 884,284.52 | $ 884,284.52 |
| **Subtotal – Attorney's Fees Claims** | **$1,845,140.80** | **$1,507,189.89** |
|  |  |  |
| Kramer, Rayson (Murrian fees) | $ 19,136.00 | $ 19,136.00 |
| Special Master Winchester | $ 14,895.00 | $ 14,895.00 ** |
|  |  |  |
| Court reporter fees | $ 6,484.00 | $ 6,484.00 |
| Allen and Stahl | $ 8,594.00 | $ 8,594.00 |
| **Subtotal – TRCP 54.04 costs** | **$ 49,109.00** | **$ 49,109.00 ** |
|  |  |  |
| Default Rate on Loan Amount Due | $ 73,573.51 | $ 73,573.51 |
| Default Rate on Attorney's fees | (on all amounts) | -0- |
|  |  |  |
| **Grand Totals** | **$1,967,823.31** | **$1,629,872.40** |

This Special Master believes and avers that he has now fully complied with the Order of Reference, as amended, and has made investigations, determinations, and findings as ordered and directed by this Honorable Court. Accordingly, this Special Master prays that he be discharged from further duties under the Order of Reference, as amended, and for such other and further relief as to which he and the parties may be entitled under the circumstances.

*/ Subject to $60,000.00 reduction pursuant to Section III, Part C, Par. xxiv, if applicable.
**/ Subject to final billing by Special Master Winchester.

Case 3:09-cv-00169  Document 13-10  Filed 06/29/09  Page 40 of 97  PageID #: 326

Pursuant to an agreement of Alcoa and New Midland, this Special Master will submit his final fee applications in equal amounts to Alcoa and New Midland, subject to approval of this Honorable Court in the event that the parties object to the reasonableness of such fees and expenses, with such pro-rated amounts to be recovered by Alcoa for reasons previously stated.

This the 22nd day of September, 2005.

Respectfully submitted by:

J. Michael Winchester, Special Master
BPR #006049

Winchester, Sellers, Foster & Steele, P.C.
Suite 1000, First Tennessee Plaza
800 South Gay Street
Knoxville, TN 37929
Phone: (865) 637-1980

I hereby certify that the within is a true
Copy of the original filed in this court.

Clerk & Master

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and exact copies hereof (without Transcript previously provided) have been served upon all parties in interest or their counsel by delivering a copy hereof to the following parties via United States Mail, facsimile transfer, electronic transmission, or hand delivery, properly addressed and with sufficient postage thereupon to carry the same to its destination:

David L. Braverman, Esq.
Braverman, Kaskey & Caprara
One Liberty Place, 21st Floor
Philadelphia, PA 19103-7334
*Via regular mail* and
*fax to: (215) 575-3801*

James S. Chase, Esq.
John A. Lucas, Esq.
Hunton & Williams
900 S. Gay St., Suite 2000
Knoxville, TN 37902
*Via hand delivery*

Thomas S. Scott, Jr., Esq.
Ball & Scott
550 West Main Avenue, Suite 610
Knoxville, TN 37902
*Via hand delivery*

Charles W. Van Beke, Esq.
Wagner, Myers & Sanger
800 S. Gay Street, Suite 1801
Knoxville, TN 37902
*Via hand delivery*

David T. Black, Esq.
329 Cates Street
Maryville, TN 37804
*Via regular mail* and
*fax to: (865) 982-5776*

Brian P. Flaherty, Esq.
Wolf, Block, Schorr & Solis-Cohen
1650 Arch Street
Philadelphia, PA 19103
*Via regular mail* and
*fax to: (215) 405-2948*

This 22nd day of September, 2005

Winchester, Sellers, Foster & Steele, P.C.

By: _____

W:\JMW\New Midland Plaza\Final Report.doc

**9**

IN THE CIRCUIT COURT FOR BLOUNT COUNTY, TENNESSEE
EQUITY DIVISION

NEW MIDLAND PLAZA )
ASSOCIATES, et al, )
                   )
        Plaintiffs )
                   )

V. )                    CIVIL ACTION
                   )    NO. E-18053
                   )
FIRST UNION NATIONAL )
BANK, et al, )
                   )
        Defendants )

FILED
SEP 22 2005
JAMES A. CARROLL
CLERK

APPEARANCES:

        BRIAN FLAHERTY,
        DAVID T. BLACK,
        via telephone,
        Attorneys for the Plaintiffs,
        New Midland Plaza Associates, et al .

        MARK FOSTER,
        Attorney for the Defendant,
        Alcoa Calderwood, LLC

        LARRY HUTCHER,
        PETER LEVITT,
        via telephone,
        Attorneys for the Defendant,
        Alcoa Calderwood, LLC

                    TRANSCRIPT

                        OF

                    PROCEEDINGS

                  June 10, 2005

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1          MR. WINCHESTER:  Okay.  Who do I have

2     with us?

3          MR. FLAHERTY:  Brian Flaherty and David

4     Black for Marty O'Boyle and his company.

5          MR. WINCHESTER:  Hey, David.

6          MR. BLACK:  Hey, Mike.

7          MR.`FOSTER:  And Mark Foster, Larry

8     Hutcher, Peter Levitt are here for Alcoa

9     Calderwood, LLC, and with me in our office is the

10    court reporter whose name is Denise Hood.

11         MR. WINCHESTER:  All right.  Thank you,

12    gentlemen.  Good to talk to all of you.

13         MR. FLAHERTY:  Your Honor,`I think I

14    should go first because I can report on what's

15    happened.  Mr. O'Boyle did visit his doctor

16    yesterday in Philadelphia, and I wish I could say

17    that I had spoken --

18         MR. FOSTER:  Brian, I'm sorry, the court

19    reporter is going to need everyone to say their

20    name before they begin speaking.

21         MR. FLAHERTY:  Okay.  Let me start over

22    again.  It's Brian Flaherty speaking.  I have not

23    been able to speak personally with Mr. O'Boyle,

24    but I did receive word from him that he saw his

25    doctor yesterday.  The doctor has advised him that

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1      he needs to have a stress test on August 22nd, and

2      that the doctor will see him, I believe it's on

3      September 8th to review the results of the stress

4      test.  And it's my understanding that although I

5      haven't spoken to the doctor, that the doctor

6      believes that he should not be working or

7      participating in stressful activities until after

8      the results of that.  That's all I can report.  I

9      wish I had more.  I have not spoken to the doctor,

10      but that's what I can report today.

11      So with that, as a guide, what I guess I

12      would propose is that we schedule something for

13      September, and then I can get more information for

14      -- to give people more of an idea as exactly what

15      the problem is.

16      MR. WINCHESTER:  Well, this is Special

17      Master Winchester.  Let me go back over that again

18      so I can make sure -- some of that was breaking

19      up, but let me make sure I heard everything, Mr.

20      Flaherty, that you just said.  First of all, you

21      said that Mr. O'Boyle had just been to the doctor

22      yesterday?

23      MR. FLAHERTY:  Yes.  That was the time

24      that he could get an appointment following the

25      events of early May when he first had this

FORM CSR · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    problem.  That was apparently the first time he

2    was able to get in there to have the follow-up

3    visit that I mentioned back in early May, and

4    that's why we scheduled this hearing for today, is

5    that I was hopeful that I would have more

6    information and indeed I do have more information.

7    I don't have as much as I would ideally like, but

8    that's what I can tell you.

9                    MR. WINCHESTER:  And then what you're

10   saying is, then, the next time he will be going to

11   the doctor is when?

12                   MR. FLAHERTY:  August 22nd·for a stress

13   test, and then he will have an appointment to

14   review the results of the stress test with his

15   doctor on September 8th.

16                   MR. WINCHESTER:  Appointment to review

17   -- and are you telling me right now that the

18   doctor is saying that he cannot participate in any

19   preparation or participation in this final hearing

20   until a time yet to be determined; is that what

21   you're saying?

22                   MR. FLAHERTY:  I can't swear to that,

23   Mr. Winchester, and I'm not going to do that

24   unless I could.  I can tell you that I have

25   received communication from Mr. O'Boyle telling me

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-826-6313

1        that that's what the doctor has stated, but I have

2        not been in touch with the doctor myself yet and

3        really conducted any kind of in-depth inquiry

4        about that that I can report to the Court, but,

5        yes, that is my belief as to what Mr. O'Boyle has

6        told me that the doctor had said.

7                MR. WINCHESTER: So we won't know under

8        these facts and circumstances unless something

9        breaks before these dates -- we may not know when

10       we can -- when he's available to even participate

11       in your preparation until September the 8th.

12              MR. FLAHERTY: That's right. I wouldn't

13       want to go so far as to say he couldn't

14       participate in my preparation. He might be able

15       to do that even now. I can't swear to that, Mr.

16       Winchester.

17              MR. WINCHESTER: Yes.

18              MR. FLAHERTY: I do think, in fairness,

19       that he couldn't participate in the hearing, and

20       as I said last time, we do need him with his

21       extensive knowledge of the case, et cetera, to

22       participate in the hearing as a witness.

23              MR. FOSTER: Special Master Winchester,

24       are you ready for us to discuss our side?

25              MR. WINCHESTER: I'm looking to see if I

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    have any more questions.  Let me finish first and

2    then I'll let you all respond.  Let me make sure

3    I'm understanding everything that I'm being told.

4    Mr. Flaherty, without me revealing any information

5    that's been disclosed to me, I guess is

6    confidential about his health condition --

7              MR. FLAHERTY:  Right.

8              MR. WINCHESTER:  -- it was my

9    understanding, and tell me if I've misunderstood,

10   I just want to make sure I know where we are, I

11   was looking back in my notes to get ready for this

12   hearing.  When you contacted me, I think, on or

13   around May the 11th, we had a -- I was advised Mr.

14   O'Boyle was ill, he was going to be released at or

15   about that time to go home and that he was not

16   available to assist you or to attend a hearing.

17   There was later follow-up confirming that he had a

18   condition that needed -- that certainly justified

19   the delay, and it was my understanding that then

20   you went to -- or that the parties jointly went to

21   see Judge Young.  He entered an order May the 18th

22   that required the plaintiffs to provide me and Mr.

23   Van Beke with a follow-up report after the next

24   medical evaluation, which evaluation was to occur

25   within the next two weeks.  Let me stop there for

1    just a second. That would have been roughly the

2    -- you know, June the 2nd or so. Was Mr. O'Boyle

3    not evaluated at all during those two weeks?

4         MR. FLAHERTY: It is my understanding

5    that he was not, Your Honor, and the reason was

6    that he couldn't get an -- I can't tell you

7    exactly what all the details were, but he was not

8    evaluated by the treating doctors until the 9th,

9    and that's why when last week these e-mails came

10    in, and it's my fault for not advising you earlier

11    of the date that he -- his appointment wasn't

12    until June 9th, and I'll accept responsibility for

13    that, but then there were these e-mails last week

14    inquiring as to what was going on, and I responded

15    immediately saying his appointment wasn't until

16    the 9th and I suggested a call today or Monday so

17    that I could find out and give a report. And I

18    have given the only report that I can give. I

19    wish it were more complete, believe me, but that's

20    the only report that I can, in good faith, give

21    right now.

22         MR. WINCHESTER: Well, so there must

23    have been representations made to Judge Young at

24    or about the time he entered the May 18th order

25    advising him that there was, in fact, supposed to

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

1    be a medical evaluation within those two weeks.

2    Is that what -- I wasn't party to that, so I'm

3    just asking you were those representations made to

4    Judge Young?

5              MR. FLAHERTY:  I can tell you that my

6    recollection is that what was said to Judge Young

7    was said by me, and it was that at that time, the

8    expectation was that Mr. O'Boyle would be

9    reevaluated within two weeks.  There was no known

10   time, no known appointment date.  I did not

11   represent there was a specific appointment.  I

12   represented approximately two weeks, and that's

13   what Judge Young chose.  It didn't turn out that

14   way but only by a few days.

15             MR. WINCHESTER:  So, in fact, he didn't

16   go back in to see the doctor until at least

17   another week after that two-week period, and then

18   you're just finding out bits and pieces, I guess,

19   since yesterday what his schedule is for this

20   stress test and then the appointment to review it

21   with his physician, which pushes us on that

22   schedule into September.

23             MR. FLAHERTY:  That's correct.  The only

24   thing I would add is, and I'm not sure what you

25   were trying to convey by "didn't go back in to

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

see." I don't think it was a matter of Mr. O'Boyle's choice as to go on the 9th as opposed to the 1st or 2nd. It is my understanding that Mr. O'Boyle asked for an appointment as early as he could, and he was given one on June 9th.

MR. WINCHESTER: Okay. Let me see if I have anything else, then I want to hear from the other side. I sent a letter May the 25th to everyone, I hope they got it, I think you did, basically saying as soon as I receive the follow-up information on his medical condition, it was my intention to set up a conference call and to set the hearing dates and then come back off the hearing dates on the motions in limine and objections and then revise the scheduling order and then supplement my report and move on.

MR. FLAHERTY: Right.

MR. WINCHESTER: So that's how I perceived moving forward, and then I was looking to see if we had had another discussion. There was an exchange of e-mails with Mr. Van Beke's office on June the 3rd. I got Mr. Hutcher's e-mail, at which time I then e-mailed, I believe, to everyone that the parties need to provide a follow-up report as soon as possible along with

available dates to reset the hearing, and then if

I didn't get those dates by June the 7th, I would

set the final hearing in August and revise the

scheduling order accordingly without further

delay.  I assume everyone got that e-mail.

        MR. HUTCHER:  We did.

        MR. FLAHERTY:  We got all those e-mails.

Yes.

        MR. WINCHESTER:  So, and then after

that, Mr. Foster advised everyone that -- reminded

everyone Mr. Van Beke was out of pocket, and the

reason I'm going back over this for the record is

I want to see if everybody is receiving everything

that I'm looking at or if there's something I

didn't receive that I should have looked at to get

ready for this.  I did receive from Brian Flaherty

a follow-up e-mail on June the 6th, giving me --

where I'd requested the update.  He did say that

he was going to visit the doctor on the 9th and

then I said fine, we would talk about this on the

10th, and then there's an e-mail where someone

realized that someone had been left off of the

e-mail list.  Now, is there anything else as

between these parties or their attorneys that may

be relevant to what we're talking about today, Mr.

1   Flaherty, that I need to look at?

2           MR. FLAHERTY:  The only thing I would

3   add is that I've been trying to get more

4   information today, haven't been able to get it

5   yet, but I would be willing to supply more

6   information in detail to you, Master Winchester,

7   as soon as I get it, whether it's later today or

8   on Monday, if you want more information because,

9   candidly, I agree with you.  I wish I had more

10  detail about the results of yesterday's visit, but

11  I just don't have it yet and I can't give it to

12  you because I don't have it.

13          MR. WINCHESTER:  All right.  Let's hear

14  from the other side.  Who's going to speak for

15  Alcoa?

16          MR. FOSTER:  I will, Your Honor.  This

17  is Mark Foster.

18          MR. WINCHESTER:  All right.  Mr. Foster,

19  go ahead.

20          MR. FOSTER:  There was one document that

21  I thought should be added to the list that you

22  just read, and that's our e-mail of this Monday,

23  and we wrote that e-mail and it says basically

24  that we feel that Mr. O'Boyle should have been

25  evaluated during the two months that was ordered.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    MR. WINCHESTER: Two weeks?

2         MR. FOSTER: Two weeks that was ordered,

3    and that we really didn't think that the

4    scheduling of this hearing should be delayed any

5    more than the two weeks even until the 7th, and

6    that's why we asked for the hearing on Tuesday,

7    the 7th. So I think that's just an additional

8    e-mail, but I guess Alcoa's position in this is

9    that this needs to be heard as soon as possible,

10   and just as some background, this hearing was

11   originally scheduled to be resolved totally by

12   April 8th and for the Special Master to issue a

13   report by April 8th, and the plaintiffs moved for

14   additional time over the objections of Alcoa, and

15   Alcoa objected because the hearing date was

16   really, I guess, one of the -- excuse me, my

17   throat is dry, the hearing date of before April

18   9th was one of the essential parts of the March

19   3rd agreement between the parties, but the Court

20   extended the time. The Special Master was not

21   willing to extend the time, and the Court extended

22   the time to May 18th and May 19th. We did not

23   hear anything about Mr. O'Boyle's condition until

24   the morning of May 11th, and on the morning of May

25   11th, Mr. Flaherty called Mr. Van Beke and said

1    that Mr. O'Boyle was in the ICU and that he had a

2    medical condition but would not disclose what that

3    condition was.  The only thing he told Mr. Van

4    Beke that morning was that it was not a mental

5    condition.

6              Later that afternoon the Special Master

7    agreed that it would be rescheduled, and Alcoa

8    objected to that, and at a hearing on the 13th,

9    Mr. Flaherty indicated to the Court that there

10   would be an evaluation.  This is my understanding

11   from speaking with Mr. Van Beke that there would

12   be an evaluation within the next two weeks and

13   that became part of the order, and the plaintiffs

14   were ordered to have an evaluation within the next

15   two weeks.

16             MR. WINCHESTER:  Is that the way you

17   read Judge Young's order?

18             MR. FOSTER:  That is how we read the

19   order.  It ordered that the evaluation is to occur

20   within the next two weeks.

21             MR. FLAHERTY:  Well, let me just speak

22   briefly on that.  I never spoke about that issue,

23   Mr. Black did.

24             MR. FOSTER:  Mr. Flaherty, Mr. Flaherty,

25   I was silent while you --

1          MR. FLAHERTY:  Well, because you're

2     making comments about what Mr. Van Beke said.

3          MR. WINCHESTER:  Mr. Flaherty, let Mr.

4     Foster finish and then I want to hear from David

5     Black about this order.  Mr. Foster, you go ahead

6     and finish.

7          MR. FOSTER:  Thank you.  On May the

8     31st, no, I believe it was June the 2nd, Charlie

9     sent out an e-mail and told everyone we had not

10    heard anything from the plaintiffs about Mr.

11    O'Boyle's medical condition, and I'll speak about

12    his condition shortly, I'm just going through the

13    procedure at this point, and then it was only then

14    that the plaintiffs said that O'Boyle's evaluation

15    was not scheduled until yesterday.  And in

16    response, we, on Monday, asked you to go ahead and

17    set the hearing and that at the hearing, the

18    plaintiffs had essentially waived their right to

19    assert any condition of Mr. O'Boyle as a

20    scheduling factor and that the Special Master

21    should just go ahead and set the hearing for

22    whatever time is available for you and the Alcoa

23    parties and whatever -- as soon as possible,

24    essentially.  So that's the procedure of what's

25    happened so far, and today Mr. Flaherty has

1    indicated that Mr. O'Boyle has a medical condition

2    that is going to require him to not do anything

3    essentially in this case until August 22nd and

4    probably September 8th.  And we submit that it's

5    likely that plaintiffs will ask for another delay

6    on September 8th.

7            MR. WINCHESTER:  Well, let's try to

8    limit our conjecture to a minimum here.  Where we

9    are now is you're objecting to any further

10   continuances.  That's what I'm gathering.

11           MR. FOSTER:  Yes, Your Honor.

12           MR. WINCHESTER:  And what are you

13   suggesting that I do?  What is it you're asking me

14   to do?

15           MR. FOSTER:  We have three dates that

16   are available in late June through late July, and

17   we are willing to go ahead and hear the hearing on

18   those dates and get this over with.  To the extent

19   the Special Master is going to consider Mr.

20   O'Boyle's condition at all and we really don't

21   think it's relevant, the Alcoa defendants really

22   have to have more than Mr. Flaherty's word about

23   what is going on here and --

24           MR. WINCHESTER:  Did Mr. Van Beke ever

25   receive any information about Mr. O'Boyle's

1    medical condition?

2           MR. FOSTER:  Yes, Your Honor.  I'll

3    explain to you my understanding of that, and it's

4    very limited, and you'll understand why.  At the

5    hearing, at the Court, on May the 13th, Mr.

6    Flaherty asked the Court to extend this proceeding

7    indefinitely, and the Court wondered what the

8    reason was, and the plaintiffs did essentially

9    what they did to you, which was just basically

10   asked them to -- asked the Court to take their

11   word for it.  The Court wanted to have some more

12   substantiation than that, so they finally allowed

13   the Court to view, I guess, a letter that had been

14   sent to you, which I have not seen.

15           MR. WINCHESTER:  All right.  I did

16   receive a letter dated May the 11th.  So you have

17   not seen that letter?

18           MR. FOSTER:  I have not seen that

19   letter.

20           MR. FLAHERTY:  But Mr. Van Beke has,

21   Judge.

22           MR. WINCHESTER:  Van Beke has?

23           MR. FOSTER:  Yes.  Yes, I was about to

24   get to that.

25           MR. WINCHESTER:  Van Beke has seen that

1  letter?

2  　　　　MR. FOSTER:  At the hearing, the judge

3  reviewed the letter and then, with agreement of

4  the plaintiffs, handed it to Mr. Van Beke.  Mr.

5  Van Beke briefly reviewed the letter and then

6  handed it back to the Court.  That is the only

7  information that Mr. Van Beke has reviewed

8  regarding Mr. O'Boyle's health condition, and that

9  is -- and Alcoa itself, the parties of Alcoa and

10  the other counsel that represent Alcoa have not

11  seen anything regarding Mr. O'Boyle's condition. I

12  don't know anything about it other than the

13  representation Mr. Flaherty made to Mr. Van Beke

14  on May 11th that it was not a mental condition.

15  　　　　MR. WINCHESTER:  Okay.  And there's been

16  no follow-up report.  Mr. Flaherty's already

17  represented to me that there had been no follow-up

18  report because there had been no follow-up

19  appointment until June the 9th.  So is there any

20  issue, then, that there was no follow-up report

21  within two weeks?

22  　　　　MR. FOSTER:  Yes, I think the fact that

23  they didn't pursue the Court's order and get a

24  follow-up report and also get an evaluation of Mr.

25  O'Boyle within those two weeks means that the

1      plaintiffs have waived their right to insist that

2      Mr. O'Boyle's condition should have anything to do

3      with the scheduling of this hearing, and, frankly,

4      their failure to even inform anybody that it was

5      not going to be -- that the evaluation itself was

6      not going to be held during that time period, I

7      think, also calls for this hearing to be scheduled

8      as soon as possible.

9               MR. FLAHERTY: Well, then blame that on

10     me because here's what happened: When I spoke to

11     both Special Master Winchester --

12              MR. FOSTER: Mr. Flaherty, I'm sorry,

13     I'd like to finish my point.

14              MR. FLAHERTY: I thought you were done.

15     Go ahead.

16              MR. FOSTER: No, I was done about that

17     procedural aspect. I'd like to discuss Mr.

18     O'Boyle's relevance to this hearing. Mr. O'Boyle

19     is not a party to the attorneys' fees proceeding.

20     The attorneys' fees proceeding is a party between

21     New Midland Plaza Associates and Alcoa Calderwood,

22     LLC. Mr. O'Boyle is a partner of New Midland

23     Plaza Associates, but he is -- he's not an

24     attorney, and he can't speak to the reasonableness

25     or the necessity of any of these fees and all of

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

1     the attorneys that New Midland -- that have

2     represented New Midland throughout the many years

3     of this litigation will be available at that

4     hearing to opine on those matters. And, frankly,

5     we don't see what Mr. O'Boyle can add and he's not

6     really a relevant party to this attorneys' fee

7     proceeding. Therefore, his health is -- if,

8     indeed, he is sick, then it's regrettable, but we

9     have no way of knowing that, and we also think

10    that he's not a necessary party to determining

11    whether the fees that New Midland forced Alcoa to

12    incur were incurred reasonably and necessarily.

13          So we believe that even if he is sick,

14    then the Special Master should not take that into

15    account in scheduling this hearing.

16          MR. WINCHESTER: Anything else at this

17    time?

18          MR. FOSTER: Well, I'd like to go ahead

19    and give you the dates we're available. We're

20    available on the June 30th and July 1st, and we're

21    also available on July 28th and July 29th.

22          MR. WINCHESTER: Hang on a minute.

23          MR. FOSTER: Okay. Sure.

24          MR. WINCHESTER: All right. What were

25    those dates in June again? I was thumbing through

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    my calendar trying to catch up with you.  You gave

2    me two June dates.  What were those?  And I'll

3    just tell you now, the June dates are not possible

4    for me, so don't -- there are not going to be any

5    June dates.  I thought there had been a discussion

6    about some August dates.  Did I miss something on

7    this, but go ahead.

8              MR. FOSTER:  The June date is June 30th

9    and July 1st, and there's two July dates that are

10   possible, and we're willing to schedule it any

11   time in August, but we'd prefer it to be held as

12   soon as possible.  The July dates are July 28th

13   and July 29th, and there's also a possible date

14   which is July 11th and July 12th.  It's only

15   possible because Mr. Lucas has a trial on those

16   two days, from what I understand speaking to his

17   paralegal, and he will not be available, but they

18   have moved to continue that trial, and if the

19   continuance is granted, we would speak with Mr.

20   Lucas, and I assume he would be available for

21   hearing, and he's the only one on our side --

22   well, not on our side, but that our side would

23   intend to call that would be not available on that

24   date.  So those are the dates we'd prefer.  We

25   could do it any date in August, but we would

1    prefer for it to be held as soon as possible,

2    preferably June 30th and July 1st.

3              MR. WINCHESTER:  All right.  What else?

4    Is that it?

5              MR. FOSTER:  That's it for right now.  I

6    think if the Special Master rules that his health

7    is relevant or that they haven't waived their

8    right to insist on his health being relevant, that

9    the Alcoa defendants have a right to discovery

10   regarding what activities Mr. O'Boyle has been

11   involved in since May 11th.

12             MR. WINCHESTER:  There's not going to be

13   any more discovery, at least that I'm going to

14   authorize or agree to.  So if any of you all are

15   planning on taking any more discovery, you're

16   going to have to go see Circuit Judge Young

17   because there's not going to be any more

18   discovery.

19             MR. FOSTER:  Is that just because the

20   discovery deadline has passed or because of his

21   health condition?

22             MR. WINCHESTER:  Because the discovery

23   deadline has passed, and I don't see how there's

24   anything you could be asking Mr. O'Boyle that is

25   going to be helpful to me on deciding the issues

1    that are before me.

2         MR. LEVITT:  If I may, Special Master,

3    it's Peter Levitt, I have one more thing to add to

4    what Mr. Foster said.

5         MR. WINCHESTER:  Go ahead, Mr. Levitt.

6         MR. LEVITT:  And that is this fee

7    proceeding was agreed to in April as part of an

8    overall resolution where there was going to be a

9    payoff of a loan, and as part of that agreement

10   that was worked out before Judge Young and recited

11   on the record, it was represented to Judge Young

12   by counsel for New Midland that this matter, the

13   fee portion of it, would be finally resolved by

14   April 11th.  That was a material inducement for us

15   to agree on the payoff arrangement that was agreed

16   to in court.  It was stated several times on the

17   record.

18         MR. WINCHESTER:  That was before Judge

19   Young?

20         MR. LEVITT:  That was before Judge

21   Young.  Yes.  This proceeding was going to be

22   finished, all done with an order from the Special

23   Master by April 11th and obviously we relied on

24   that.  Now, we're a long ways from April 11th

25   already, and now we're talking about if New

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    Midland has their way of pushing it back to late

2    fall. So I think that's an irrelevant factor.

3    There was a time factor from the very beginning of

4    this, and we've been deprived of the benefit of

5    the bargain.

6                    MR. WINCHESTER: All right. Any other

7    comments?

8                    MR. FOSTER: I think one thing to add to

9    Mr. Levitt's comment is that the agreement was

10   that the proceeding would be resolved and the

11   money in court would be disbursed to Alcoa by

12   April 11th, and Alcoa has not received any income

13   since the money was paid into the court, and it's

14   a burden on Alcoa to continue to pay its attorneys

15   but not have any income.

16                   MR. WINCHESTER: Now, Alcoa did receive

17   its payoff of the principal and interest on the

18   loan.

19                   MR. FOSTER: At the time the money was

20   paid into court. That's correct.

21                   MR. WINCHESTER: All right. And then

22   there was an agreement, and I've looked at all

23   this, but correct me if I'm wrong because

24   sometimes you gentlemen get together and I find

25   out about it later, and while I'm trying to be

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    diligent, I can't go and look behind you.  I'm

2    expecting you all to tell me when something

3    impacting me is going on with Circuit Judge Young,

4    and you've been pretty good about it, but it's my

5    understanding you still have escrowed

6    approximately 1.5 something million dollars; is

7    that right?

8            MR. LEVITT:  That's correct.

9            MR. WINCHESTER:  All right.  And that's

10   in the registry of the Court, it's invested and

11   that is somewhat estimated to be enough to cover

12   the attorneys' fees issues that are before me.  Is

13   that roughly correct?

14           MR. FOSTER:  Yes.  And if the amount

15   ultimately established exceeds that amount, then

16   New Midland would pay that directly.

17           MR. FLAHERTY:  Although New Midland's

18   already withdrawn a hundred thousand dollar claim

19   as part of that, but --

20           MR. WINCHESTER:  Okay.  No, I think I'm

21   up to speed on all that.  All right.  Anything

22   else from Alcoa that I need to hear before I go

23   back to Mr. Flaherty and his co-counsel?

24           MR. FOSTER:  I just wanted to point out

25   that the last comment made by New Midland --

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1              MR. HUTCHER:  Peter, it's Larry Hutcher.

2      Do you want to address the issue of the eighteen

3      months on the bankruptcy?

4              MR. WINCHESTER:  Who's talking?

5              MR. HUTCHER:  That was Larry Hutcher.

6      Peter, do you want to address that?

7              MR. LEVITT:  I would rather not get into

8      that.  I just feel that that's collateral right

9      now.

10              MR. HUTCHER:  All right.   .

11              MR. WINCHESTER:  All right.  So anything

12      else from Alcoa?

13              MR. FOSTER:  Yes, Your Honor.

14              MR. WINCHESTER:  Okay.

15              MR. FOSTER:  Just before I was about to

16      say the last comment made by New Midland was made

17      by Brian Flaherty.  The court reporter was

18      indicating she missed who was speaking.

19              MR. WINCHESTER:  That's fine.

20              MR. LEVITT:  Well, let me just say, and

21      I don't want to get sidetracked, this is Peter

22      Levitt speaking again, I'm sorry, under an order

23      from the bankruptcy court in Florida, New Midland

24      was not permitted to file bankruptcy for a period

25      of time.  That period of time expires in January

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1  of next year, January of 2006. And one of our

2  concerns is that New Midland will file bankruptcy

3  again in January 2006, and if they do so, under

4  bankruptcy law, they may be entitled to get a

5  release of the funds in the court registry, and we

6  may -- Alcoa may become a generalized secured

7  creditor at that time. We may lose the benefit of

8  that court registry, and we're concerned that this

9  matter is going to drag on to the point where

10  we're facing another New Midland bankruptcy. We

11  have no hard information that that's in the works,

12  but it's a possibility. I think that's what Mr.

13  Hutcher was referring to.

14      MR. WINCHESTER: All right. I'm glad

15  you cleared that up because I was wondering what

16  the relevance of those comments were. Now I do.

17  Okay.

18      MR. HUTCHER: And this is Larry Hutcher.

19  One of the ways that we may suggest as a way to

20  allay those fears that we have, if New Midland

21  would agree that those are hard assets that are

22  secured that can be deemed as security, that would

23  be beyond the scope of a bankruptcy ruling, giving

24  us the comfort that this delay is not intended to

25  ultimately deprive us of our benefit to get paid,

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    which is obviously a legitimate concern of all of

2    the counsel in this matter, who are vigorously and

3    anxiously looking to the payment of those sums of

4    that money to get us paid.  That's the only thing

5    I wanted to add.

6            MR. WINCHESTER:  Okay.  Anything else

7    from Alcoa?  All right.  Let's go back to Mr.

8    Flaherty and/or Mr. Black.  I want to hear -- the

9    first thing I want to hear, Mr. Flaherty, is --

10   I've heard enough about the medical evaluation and

11   the timing, and I already know what I'm going to

12   do about that.  Tell me how Mr. O'Boyle's

13   testimony would be relevant on the issues that are

14   before me on the attorneys' fees claims.  Tell me

15   how his testimony, either in person or by

16   deposition excerpt, if that's what it comes down

17   to can help me decide these issues, because I'm

18   going to go ahead and tell you in advance I've

19   looked at everything everyone has submitted, and I

20   do not understand right now how either his

21   availability to participate with you other than

22   you getting authority to make decisions,

23   concessions or agreements, how his participation

24   as a witness is going to make any difference or

25   give me any relevant information that I can use to

1   make my decision on these attorneys' fees. Now,

2   you tell me why, and I don't need you to write a

3   thesis, I just need you to tell me how that's

4   going to be relevant.

5           MR. FLAHERTY: Sure. Mr. O'Boyle has,

6   from the outset of this matter, as everybody

7   knows, in fact, I think it sometimes displeases

8   the plaintiff that this is so, is intimately

9   involved in every single aspect of this matter.

10   Every client's entitled to handle matters their

11   own way. That's the way he chooses to handle all

12   of his legal matters, not just this one, and I

13   don't say that because I need to have him there

14   acting as kind of co-counsel. He won't be there

15   as co-counsel. I say that because that's the way

16   he's been acting from the very beginning of this

17   case, and, therefore, he has encyclopedic

18   firsthand knowledge at his fingertips of every

19   single pleading and every single event that

20   happened, and that's relevant to have and explain

21   for two reasons: Number one, I need him at my

22   side to explain to me so I can respond and react

23   to the testimony offered by who's ever going to

24   testify for them. For example, Mr. Levitt will

25   take the stand and say it was necessary that we

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

did this, this and this and that I get paid a sum.
They're reasonable and necessary because thus,
thus and thus happened in the lawsuit. You've
seen that throughout their pleadings. That's how
they intend to proceed. I need somebody who can
tell me and, if necessary, testify, and I believe
he will be necessary to testify that that's not
so, it's not so because, in fact, it was not
necessary to do that because what you need to know
is the prior month, the prior two months, et
cetera, something else happened and you need to
place that in context.

We believe that Mr. O'Boyle's testimony,
in that regard, is absolutely critical and his
assistance to me and Mr. Black, in real time at
the trial, is also critical for that reason.

MR. WINCHESTER: I'm trying to figure
out if I even agree with any part of that because
right now it appears to me the reasonableness of
the attorneys' fees is solely within the province
of the Court, me. Under our rules of ethics,
under the guidelines, as I understand, that have
been fleshed out by case law and by our
professional rules and you're telling me that I
should listen to Mr. O'Boyle or some other

1    layperson as to whether or not some action that

2    Mr. Hutcher took was necessary, needed, reasonable

3    and that he charged the right amount of money.

4        MR. FLAHERTY:  I'm not asking you to

5    accept Mr. O'Boyle's opinion as a lawyer.  I'm

6    asking you to accept the factual statements laid

7    out by Mr. O'Boyle in his explanation of what

8    happened in the litigation as the factual

9    predicate against which you will measure the

10   persuasiveness of the testimony offered by Mr.

11   Levitt, for example, just to pick him out, that

12   something he did was necessary.  Mr. Levitt will

13   say, for example, it was necessary and reasonable

14   that we took the following steps thus and such.

15   We believe that's inaccurate.  Now, we don't have

16   an expert who's going to come on and say that's

17   inaccurate because of something.  We have

18   arguments made by counsel, that is me and Mr.

19   Black, and we have factual statements laid out by

20   Mr. O'Boyle and explanations of what was going on

21   in the litigation that he will be able to offer,

22   absolutely we do.  It's not simply a matter of

23   having a swearing contest between lawyers over

24   what was reasonable.  It'd have to be based upon

25   factual predicates that will be laid out that can

1    only be explained on our side by Mr. O'Boyle.  He

2    was a party to every single one of these events

3    that happened, and Mr. Black and I were not.

4              MR. WINCHESTER:  I'm still having a very

5    difficult time understanding how Mr. O'Boyle's

6    evaluation, understanding and perceptions of what

7    were going on would, in any way, any way, impact

8    the impressions, understandings or legal judgment

9    of Mr. Levitt, for instance, on the decisions he

10   made, how much time he spent doing something and

11   whether he charged a reasonable fee or not.  I'm

12   not going to care -- I couldn't care less what Mr.

13   O'Boyle or any other layperson has to say about

14   that, because I don't believe he has any relevant

15   information that's going to help me understand or

16   evaluate what Mr. Levitt did.  What you're talking

17   about is basically saying Mr. O'Boyle will say,

18   no, Mr. Levitt, you're either not telling the

19   truth or that didn't happen and you just

20   misperceived it and we shouldn't have to pay for

21   something that you just messed up or didn't

22   understand.  So you're basically saying Mr.

23   O'Boyle is going to give testimony that basically

24   says something Mr. Levitt understood or based an

25   action on was inaccurate.

1          MR. FLAHERTY:  And Mr. O'Boyle would be

2     able to say, for example, it's inaccurate and I

3     will show you the following pleadings that

4     demonstrate that that's inaccurate, and here's

5     what was really going on in the case at that

6     point, and I certainly would hope that the Master

7     would listen to the factual presentations that we

8     would make about what was going on in the

9     litigation at various times in assessing whether

10    various things done by the plaintiffs were

11    necessary.  I surely would hope you would listen

12    to that.

13          MR. WINCHESTER:  Well, I mean I would

14    assume you've already made the arguments that you

15    intend to make as part of the filings and

16    submissions you've made.

17          MR. FLAHERTY:  We've made those

18    arguments, but we've also anticipated two days of

19    hearings at which we both anticipated, all sides

20    have anticipated, live testimony.  That's always

21    been what we've understood is going to happen and

22    cross examination, and we fully expect that.  We

23    did not file can pleadings where all the testimony

24    and all the proof is before the Court.  There is

25    more proof to come in.  That's what I thought two

1    days of hearings were about.

2              MR. FOSTER:  Your Honor, on the Alcoa

3    side, I think the proof that needs to come in is

4    the attorneys need to testify that the fees are

5    reasonably incurred and they're necessarily

6    incurred, and if the plaintiffs don't intend to

7    present any contrary proof, I don't think there's

8    a need to go beyond that.

9              MR. FLAHERTY:  Well, I can assure you we

10   do intend to present contrary proof.

11             MR. WINCHESTER:  Well, and, you know,

12   I've already told both sides that we're not going

13   to -- we're going to have a two-day hearing.  We

14   all agreed to that, and that's what we're going to

15   do even if I have to limit time.  I'm not

16   envisioning right now that -- and I'm trying to

17   take your analysis, Mr. Flaherty, and give it the

18   broadest leeway that I can --

19             MR. FLAHERTY:  Well, I --

20             MR. WINCHESTER:  No, let me finish

21   because, quite frankly, I just don't see right

22   now, evaluating what has been submitted on both

23   sides -- what I understand my charge to be, how I

24   understand attorneys' fees, their reasonableness,

25   whether or not they should be allowed, whether or

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    not they're ethical, whether or not they're proper

2    under the circumstances and under the facts of

3    this case, I'm looking at just about all of those

4    issues at this time with some small exceptions,

5    some small exceptions being matters of law or

6    within my discretion. And, again, your statements

7    that, oh, well, there may have been things that

8    someone did that they did not need to do based on

9    some mistake of fact, position that was

10   inappropriate, well, a layperson telling me -- I

11   mean I would be relying on -- I guess I'm looking

12   at each of the lawyers as being the experts here,

13   certainly not Mr. O'Boyle. You're basically

14   saying there's going to be a fact witness, a

15   layperson who may say a lawyer misperceived

16   something or took action based on some facts years

17   ago that didn't really occur.

18           MR. FLAHERTY: That's true, and I think

19   you can do that. And, moreover, even assuming he

20   weren't to take the stand, which he will, he's

21   going to be at my elbow every step of the cross

22   examination of, for example, Mr. Levitt and Mr.

23   Hutcher, and, believe me, that's what we intend,

24   and I honestly do not have the knowledge that he

25   has. He has encyclopedic knowledge of this

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1   matter, and I'll be the first to admit that I

2   don't have it.  Now, I'm going to learn -- well, I

3   have learned a lot about it already, and I will be

4   ready to conduct this hearing, but I need Mr.

5   O'Boyle to participate with me in this hearing

6   both as a critical assistant to me and as a

7   witness, as I've said.

8          MR. BLACK:  And my comment was going to

9   be he may also be necessary to authenticate

10  documents unless the defendants are stipulating

11  the exhibits that have been filed.

12         MR. WINCHESTER:  Okay.  I'm going to

13  let Mr. Foster or Mr. Hutcher or Mr. Levitt make a

14  brief response to that, and then I'm going to go

15  ahead and tell you what I think we need to do and

16  what I'm going to order.

17         Any other comment, Mr. Foster?

18         MR. FOSTER:  Yes, I have two real brief

19  comments.  First is that there's, even under the

20  earliest of our dates, at least three weeks for

21  these lawyers to review the case file and

22  understand what's gone on to prepare to cross

23  examine the attorneys, and Mr. O'Boyle's not

24  needed in that capacity for that reason.

25         The second point is that Mr. O'Boyle

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    can't produce admissible evidence regarding the

2    necessity of any action that Alcoa's attorneys

3    have taken because he's not -- he can't -- he's

4    not an expert, and he can't qualify as an expert,

5    and his testimony is just not necessary or just

6    not admissible on that matter.

7                MR. HUTCHER:  Well, this is Larry

8    Hutcher.  We are always prepared to try to

9    streamline this proceeding by reviewing any

10   documents.  I can't imagine there are any

11   documents that they would want to admit that we

12   would not also want to admit.  So, David, if you

13   want to give us those in advance and see if that

14   eliminates any authenticity, I'm happy to look at

15   that.

16               MR. WINCHESTER:  Well, let's talk about

17   that for a minute.  Let me stop all of you.  First

18   of all, we've already exchanged -- you've already

19   exchanged your witness lists, and I'm not opening

20   that back up.  That's done.

21               MR. BLACK:  Right.

22               MR. WINCHESTER:  Number two, we've

23   already had deadlines for you to make your

24   submissions, and there's not going to be any more

25   exhibits come in.  If those exhibits aren't in

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313



1    here and I haven't seen them already and they

2    haven't been exchanged, there's not going to be

3    any more.

4            MR. FLAHERTY:  Well, we've exchanged our

5    lists here.  You have not seen all the exhibits,

6    Mr. Winchester.

7            MR. WINCHESTER:  Well, where are they?

8            MR. FLAHERTY:  They're listed in the

9    materials that have been submitted to you, but you

10   haven't seen them all.  That's what was going to

11   happen at the hearing.

12           MR. WINCHESTER:  Well, perhaps we ought

13   to do an exhibit list and exchange the exhibits so

14   we can all see them in advance.  Wouldn't that

15   speed things up?

16           MR. FLAHERTY:  I absolutely intend to do

17   -- we've already done that in the sense of giving

18   the list to each other, but the actual -- everyone

19   knows what the exhibits are.  We don't intend to

20   use a single one that we haven't listed.

21           MR. BLACK:  Well, there may be some

22   demonstrative exhibits that take some of the facts

23   and statistics.  I mean I --

24           MR. FLAHERTY:  Well, that's true, but I

25   mean apart from the actual document.

FORM CSR- LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1          MR. BLACK:  Right.

2          MR. FLAHERTY:  And they're all --

3      everybody knows what they are, Your Honor,

4      there's no mystery here, but you don't have every

5      one of them physically, and I don't think you've

6      seen them.  I know you haven't seen them all.

7          MR. WINCHESTER:  Well, wouldn't it be a

8      good idea for me to see them in advance so that I

9      won't have to look at them and figure out what

10     they -- and look at the detail?  I mean shouldn't

11     you -- I mean if I were trying the case, I guess I

12     would ask the trial judge if submitting the

13     exhibits -- I could put down in the revised

14     scheduling order that the exhibits need to be

15     tendered to me by a date certain, that's not going

16     to add to your work load too much.

17         MR. FLAHERTY:  Not at all.  We have no

18     problem with that.

19         MR. WINCHESTER:  Mr. Foster, do you have

20     any objection to that.

21         MR. FOSTER:  Your Honor, we have an

22     objection to them raising arguments that they

23     could have raised in their pretrial brief.

24         MR. WINCHESTER:  Now, don't get off on

25     arguments, now.  I'm asking you about an exhibit

1    list.

2          MR. HUTCHER:  We don't have a problem

3    with that.  This is Larry Hutcher.

4          MR. WINCHESTER:  Okay.  What I would

5    like for everyone to do, and I'm going to address

6    this now as part of this, I want an exhibit list

7    agreed to by the parties, and I just want one -- I

8    don't want a Plaintiff's Exhibit 1 and a

9    Defendant's Exhibit A.  How have you all numbered

10   your exhibits in your depositions?  I mean I've

11   seen some of these things and am aware of some of

12   them.  Were you planning on renumbering them at

13   the trial and giving me numbers, or how were you

14   going to do it?

15         MR. FLAHERTY:  I don't know if we talked

16   about it, but whatever you would prefer.  We can

17   start from one and go to whatever, and we can have

18   a joint list, Your Honor.

19         MR. WINCHESTER:  Okay.  Well, I think

20   you should prepare because, I mean, in my trial

21   experience, you look at some exhibit that's

22   Exhibit 1 to Mr. Levitt and it comes in as Exhibit

23   6, and then one of you all has it as Exhibit M.

24         MR. HUTCHER:  Right.

25         MR. WINCHESTER:  The history I've had

1    with this complicated litigation, you all have

2    been in it, just the little bit I've seen, it

3    makes it hard on everyone.  That's not critical of

4    any of you.  You all are doing a great job, you're

5    very thorough, but then we end up with one piece

6    of paper and it has three different exhibit

7    references in the record, and it's going to be

8    very difficult for someone looking on this to

9    figure it out.  So let's do this, and I'm going to

10   tell you when I'm going to want it here in just a

11   minute, but let's go ahead now and on the record,

12   I want the parties to get together and provide an

13   agreed list of exhibits, and that's going to need

14   to get to me ten days before the first date of our

15   final hearing, and we're going to talk about that

16   in just a minute, but ten days prior I want that

17   delivered to me, so ten days prior to our hearing.

18   And if there are exhibits that there are going to

19   be objections to, hearsay, relevance or whatever,

20   go ahead and list the exhibit and whichever side

21   has the objection, just put out objection, HS,

22   hearsay by Alcoa, or whatever, something, but I'll

23   make the decision about that and I don't want to

24   have to do those from the hip.  If I have a little

25   time to think about them, believe me, I'll make

1     the decision and we'll move on.

2              How many exhibits are we probably

3     talking about, gentlemen, hundreds?

4              MR. FLAHERTY:  I don't know.

5              MR. HUTCHER:  Well, pages or separate

6     exhibits?

7              MR. WINCHESTER:  Separate exhibits.  I

8     know that there will be hundreds of pages, but I'm

9     just asking you -- I mean am I asking you to do

10    something that's going to be burdensome?

11             MR. HUTCHER:  No.  Absolutely not.  It

12    will streamline the hearing for everyone and I --

13    this is Larry Hutcher speaking.

14             MR. WINCHESTER:  Yes.

15             MR. HUTCHER:  I think it will certainly

16    facilitate -- if we're going to get this done in

17    two days, nobody wants to be fighting over

18    exhibits, so we will get that done before we

19    appear before you.

20             MR. FLAHERTY:  All right.  I agree

21    completely with Mr. Hutcher on that, Your Honor.

22             MR. WINCHESTER:  All right.  Well, then,

23    we'll move on to the next --

24             MR. BLACK:  One question on the

25    exhibits.  Should there be rebuttal exhibits or

1    demonstrative exhibits, I would assume that would

2    come in at cross examination?

3            MR. HUTCHER: Yes, of course.

4            MR. BLACK: During the course of

5    presentation?

6            MR. WINCHESTER: Does either side have a

7    problem with that?

8            MR. HUTCHER: No. Of course not.

9            MR. FOSTER: I would say that any

10   exhibits that should have been presented in

11   connection with arguments made in the pretrial

12   brief should not be allowed in, but --

13           MR. HUTCHER: That wouldn't be

14   rebuttal, then.

15           MR. FLAHERTY: Yes, they're all within

16   the list that have already been talked about.

17           MR. WINCHESTER: All right. Well, then

18   that's what -- and I'm so ordering, then, that

19   there be an agreed upon list of exhibits for the

20   hearing delivered to me ten days prior to the

21   first date of the hearing, and it will identify a

22   single list of exhibits, that is by number, one

23   through whatever, so we won't have to worry about

24   renumbering A's and B's and C's. And if there are

25   objections by one side or the other, relevance you

1    can put an R, hearsay you can put an S.  You can

2    shorthand it any way you want to, gentlemen.  You

3    all have all done this as much as I have.  Just

4    tell me who has an objection and why, and then it

5    will really speed us up on our hearing.

6                    MR. HUTCHER:  Okay.

7                    MR. FLAHERTY:  Okay.

8                    MR. WINCHESTER:  All right.  Mr. Foster,

9    I had cut you off.  Anything else that you want to

10   tell me?

11                   MR. FOSTER:  No.  I don't think there

12   was anything.

13                   MR. WINCHESTER:  All right.

14                   MR. FLAHERTY:  Could I say one other

15   thing?

16                   MR. WINCHESTER:  No.  No, I'm through.

17   I've heard all I need to hear.

18                   MR. FLAHERTY:  All right.

19                   MR. WINCHESTER:  First of all, I've

20   looked back -- this is the Special Master, and I

21   want the court reporter to type this up and get it

22   to me as soon as she can.  First of all, I've

23   looked back at Judge Young's order of May the

24   18th.  He says that the plaintiffs shall provide

25   me and Mr. Van Beke with a follow-up report after

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    the next medical evaluation of Mr. O'Boyle, which

2    evaluation is to occur within the next two weeks,

3    unquote.

4          All right.  That's an order from our

5    judge that is very unambiguous.  It says what it

6    says.  I assume it was -- that based on what I've

7    heard about the discussions with Judge Young, he

8    understood that there was going to be an

9    evaluation and even if he didn't understand it

10    that way, he said it was to occur.  It hasn't.  It

11    hasn't.  I think that, one, they're in violation

12    -- I think the plaintiffs are in violation of that

13    order.  That's up to Judge Young.  I can't say and

14    proceed with any type of sanction or action on

15    that other than to say that the presiding judge

16    said that that was to occur by a certain date.  It

17    has not.  These delays, I believe, are prejudicial

18    to Alcoa.  I believe, from what I've read and the

19    representations from counsel for Alcoa, that this

20    delay has been prejudicial to them and is reducing

21    the benefit of their bargain by the extension of

22    time that could cause additional accrual of

23    interest, is increasing the attorneys' fees and

24    the cost and these delays could be prejudicial for

25    other purposes that are date sensitive.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1           For that reason, I'm going to go ahead

2    at this time -- and for the other reason is that I

3    do not see that Mr. O'Boyle's participation as a

4    witness -- I'm not going to say he can't appear as

5    a witness.  I'm just saying that I'm trying to

6    figure out right now and struggling with what

7    relevant information he could really give me that

8    I'm going to be wanting to hear from him that's

9    going to help me decide the issues before me.  And

10   to the extent that there are some questions about

11   the fact situations under which some lawyer took

12   action, I either believe from the record or the

13   lawyers can, on cross examination, bring out, from

14   Mr. Hutcher or Mr. Levitt or whoever they're cross

15   examining, information that will be either helpful

16   or not.  So I don't really see that a further

17   delay based on Mr. O'Boyle's availability is

18   something that is justified under these facts and

19   circumstances, that's really helpful to me and

20   that anyway -- that outweigh the prejudice to

21   Alcoa right now.  I mean we're either going to

22   continue to delay this and potentially prejudice

23   Alcoa or Mr. O'Boyle may not be available and that

24   may prejudice the plaintiffs.

25           Well, based on what I understand the

1    issues to be and the facts and circumstances of

2    this case, I believe the prejudice to Alcoa

3    outweighs the prejudice that could befall the

4    plaintiffs. So I'm going to go ahead and set a

5    hearing date. The hearing dates that I have

6    available, and the lawyers need to get their

7    calendars out, if July the 28th and 29th are

8    available, we're going to set it on those dates.

9    Otherwise, the other two dates I'm going to give

10   the parties will be August 4 and August 5, and

11   we're going to decide that right now as best we

12   can. Unless someone has an irreconcilable

13   conflict, I'm going to schedule it on one of those

14   two groups of dates. So let me ask Mr. Foster

15   first, do you want to try July 28th and 29th?

16        MR. FOSTER: Yes, we would, as soon as

17   possible.

18        MR. WINCHESTER: All right. Are those

19   dates available to counsel for New Midland?

20        MR. FLAHERTY: I'm okay on those dates.

21        MR. BLACK: I'm okay on those dates.

22        MR. WINCHESTER: Okay. Then we will set

23   the final hearing to begin at 9:00 o'clock July

24   the 28th. Can we get a courtroom, or let's talk

25   about a place that will be convenient for the

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    parties and for me.  It does not have to be in my

2    office.  It might be difficult even though I have

3    a large conference room.  What do the parties

4    propose that we do about the site of the final

5    hearing?

6           MR. FOSTER:  We could ask the Court if

7    the Court would make the courtroom available.  I

8    don't know that it is available.  I hadn't thought

9    of that.

10          MR. WINCHESTER:  Okay.  Well, would you

11   check, Mr. Foster?  You check on the availability

12   of a courtroom.

13          MR. FOSTER:  Yes, sir.

14          MR. WINCHESTER:  Okay.  And report back

15   to me and to the attorneys for New Midland as to

16   what's available and then we will go from there,

17   okay?  All right.  The next thing is I'm going to

18   then come off that date.  The exhibit list will

19   then be due Monday, July the 18th, and I'm going

20   to send a revised scheduling order that has all

21   this, but go ahead and mark that down.  That will

22   be due by July the 18th.  As far as motions in

23   limine or objections, I think we had.set that date

24   two days before or either three days before.  I'm

25   looking back at my notes now.  Those motions in

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

1     limine or objections to excerpts of any testimony

2     that are going to be presented to me will be due

3     by July the 15th.

4          All right.  Now, what other issues, if

5     any, do I need to determine other than those that

6     are still pending before me relevant to the issues

7     I'm going to decide?  Anything else?  I'm going to

8     go ahead and do a revised scheduling order that

9     has this, revised scheduling order.  I'm going to

10    provide some findings on some prior discovery just

11    so we'll have it in the record that I've already

12    decided by phone and otherwise which should get

13    the record updated through whatever day I issue

14    this fourth supplement to my order.

15          And what else is there that we need to

16    talk about today, gentlemen?

17          MR. FLAHERTY:  I'm not sure there's

18    anything.

19          MR. HUTCHER:  I don't think we have

20    anything else on the Alcoa side.

21          MR. FOSTER:  I think that resolves our

22    issues.

23          MR. BLACK:  Could I just make one

24    observation, Judge?

25          MR. WINCHESTER:  I don't know why not.

1          MR. BLACK:  I worry about the subliminal

2     suggestions that counsel keeps making,

3     particularly that Mr. Flaherty said that Mr.

4     O'Boyle's problem was not mental.  That's not the

5     way that came about, Mr. Van Beke said to Mr.

6     Flaherty, I don't know if it was tongue in cheek,

7     but it certainly is not a mental problem, and Mr.

8     Van Beke said, "Is it mental?"  "No."

9          MR. FLAHERTY:  And I responded, I must

10    say, in the same vein that Mr. Black is saying,

11    angrily, just like I am today, although I didn't

12    say it about the repetition of that point by Mr.

13    Foster.  It is purposeful, it is an effort to cast

14    a bad light on him, and, you know, Mr. Winchester,

15    exactly what the problem is as does Mr. Van Beke

16    and yet there's the subliminal message they keep

17    sending that somehow there's some mental

18    imbalance.

19          MR. HUTCHER:  Well, no, this is Larry

20    Hutcher --

21          MR. FLAHERTY:  Typical kind of nonsense

22    that we've been hearing all along.

23          MR. FOSTER:  Mr. --

24          MR. HUTCHER:  This is Larry Hutcher.

25    And if anybody took offense to that, I apologize

FORM CSR · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    on behalf of them.  I'm assuring you that neither

2    Mr. Levitt, Mr. Foster or I know anything

3    whatsoever about Mr. O'Boyle's condition.  Mr. Van

4    Beke did not tell us anything, and all I think Mr.

5    Foster was implying was that in light of the fact

6    that it is not a mental issue, that he could

7    appear and help through other ways.  We are not,

8    in any way, casting any aspersion or doubt upon

9    Mr. O'Boyle.  So if anybody took it that way, I'm

10   apologizing on behalf of everyone.

11            MR. WINCHESTER:  I think that is

12   sufficient, gentlemen.  I understand that you all

13   are zealous advocates.  Sometimes there's some

14   statements that I believe go a little bit far.  I

15   will tell you this:  Subliminally and otherwise,

16   those comments have had no impact on me.  So let's

17   move forward, and I look forward to getting the

18   additional documents from each of you.

19            MR. FLAHERTY:  Thank you.

20            MR. HUTCHER:  Thank you for your time,

21   Your Honor.

22            MR. FOSTER:  Thank you.

23            MR. BLACK:  Thank you.

24

25

1          C E R T I F I C A T E

2              I, DENISE M. HOOD, Court Reporter and Notary

3   Public, do hereby certify that the foregoing fifty pages is

4   a true and accurate transcript of the proceedings taken by

5   me on the 10th day of June, 2005.

6              This _21st_ day of _June_, 2005.

7                                    _Dm Hood_

8                                    Notary Public

9   My Commission Expires:   December 19, 2006.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# ERRATA SHEET

TO THE WITNESS: DO NOT WRITE IN TRANSCRIPT EXCEPT TO SIGN ON THE LAST PAGE ON SIGNATURE LINE.
    Please note any word changes/corrections on this page only. Thank you.

TO THE REPORTER:   I have read the entire transcript of my deposition taken on the _____ day of _____, 19___, or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the signature page and authorize you to attach the following changes to the original transcript.

| PAGE | LINE | |
|------|------|--|
| 23 | 2 | irrelevant to relevant |
| 26 | 6 | generalized secured to general unsecured |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

DATE _____  _____
                                    Witness' Signature

1    Midland has their way of pushing it back to late

2    fall.  So I think that's a relevant factor.  There

3    was a time factor from the very beginning of this,

4    and we've been deprived of the benefit of the

5    bargain.

6            MR. WINCHESTER:  All right.  Any other

7    comments?

8            MR. FOSTER:  I think one thing to add to

9    Mr. Levitt's comment is that the agreement was

10   that the proceeding would be resolved and the

11   money in court would be disbursed to Alcoa by

12   April 11th, and Alcoa has not received any income

13   since the money was paid into the court, and it's

14   a burden on Alcoa to continue to pay its attorneys

15   but not have any income.

16           MR. WINCHESTER:  Now, Alcoa did receive

17   its payoff of the principal and interest on the

18   loan.

19           MR. FOSTER:  At the time the money was

20   paid into court.  That's correct.

21           MR. WINCHESTER:  All right.  And then

22   there was an agreement, and I've looked at all

23   this, but correct me if I'm wrong because

24   sometimes you gentlemen get together and I find

25   out about it later, and while I'm trying to be

1    of next year, January of 2006.  And one of our

2    concerns is that New Midland will file bankruptcy

3    again in January 2006, and if they do so, under

4    bankruptcy law, they may be entitled to get a

5    release of the funds in the court registry, and we

6    may -- Alcoa may become a general unsecured

7    creditor at that time.  We may lose the benefit of

8    that court registry, and we're concerned that this

9    matter is going to drag on to the point where

10   we're facing another New Midland bankruptcy.  We

11   have no hard information that that's in the works,

12   but it's a possibility.  I think that's what Mr.

13   Hutcher was referring to.

14        MR. WINCHESTER:  All right.  I'm glad

15   you cleared that up because I was wondering what

16   the relevance of those comments were.  Now I do.

17   Okay.

18        MR. HUTCHER:  And this is Larry Hutcher.

19   One of the ways that we may suggest as a way to

20   allay those fears that we have, if New Midland

21   would agree that those are hard assets that are

22   secured that can be deemed as security, that would

23   be beyond the scope of a bankruptcy ruling, giving

24   us the comfort that this delay is not intended to

25   ultimately deprive us of our benefit to get paid,